[No. 43949. En Banc. January 7, 1977.]

THE STATE OF WASHINGTON, *Appellant*, v. YVONNE L. WANROW, *Respondent*.

*Donald C. Brockett, Prosecuting Attorney,* and *Fred J. Caruso, Deputy,* for appellant.

*William M. Kunstler, Elizabeth M. Schneider, Nancy Stearns, Carol Schapira,* and *Smith, Kaplan, Withey, Schapira & Ford,* for respondent.

*Alix Foster* and *David Allen,* on behalf of American Civil Liberties Union, National Lawyers Guild, and Seattle–King County Public Defender, amici curiae.

UTTER, J.—Yvonne Wanrow was convicted by a jury of second–degree murder and first–degree assault. She appealed her conviction to the Court of Appeals. The Court of Appeals reversed and remanded the case with instructions to omit a tape recording made by the Spokane Police Department of an emergency telephone call, on the basis that RCW 9.73.050 and RCW 9.73.090 which authorize the recording of such a call create an absolute bar to its admission into evidence. *State v. Wanrow,* 14 Wn. App. 115, 538 P.2d 849 (1975). We granted review and affirm the Court of Appeals.

We order a reversal of the conviction on two grounds. The first is the ground stated by the Court of Appeals regarding the erroneous admission of the tape recording. The second ground is error committed by the trial court in improperly instructing the jury on the law of self–defense as it related to the defendant.

On the afternoon of August 11, 1972, defendant's (respondent's) two children were staying at the home of Ms. Hooper, a friend of defendant. Defendant's son was playing in the neighborhood and came back to Ms. Hooper's house and told her that a man tried to pull him off his bicycle and drag him into a house. Some months earlier, Ms. Hooper's 7–year–old daughter had developed a rash on her body which was diagnosed as venereal disease. Ms. Hooper had been unable to persuade her daughter to tell her who had molested her. It was not until the night of the shooting that Ms. Hooper discovered it was William Wesler (decedent) who allegedly had violated her daughter. A few minutes after the defendant's son related his story to

Ms. Hooper about the man who tried to detain him, Mr. Wesler appeared on the porch of the Hooper house and stated through the door, "I didn't touch the kid, I didn't touch the kid." At that moment, the Hooper girl, seeing Wesler at the door, indicated to her mother that Wesler was the man who had molested her. Joseph Fah, Ms. Hooper's landlord, saw Wesler as he was leaving and informed Shirley Hooper that Wesler had tried to molest a young boy who had earlier lived in the same house, and that Wesler had previously been committed to the Eastern State Hospital for the mentally ill. Immediately after this revelation from Mr. Fah, Ms. Hooper called the police who, upon their arrival at the Hooper residence, were informed of all the events which had transpired that day. Ms. Hooper requested that Wesler be arrested then and there, but the police stated, "We can't, until Monday morning." Ms. Hooper was urged by the police officer to go to the police station Monday morning and "swear out a warrant." Ms. Hooper's landlord, who was present during the conversation, suggested that Ms. Hooper get a baseball bat located at the corner of the house and "conk him over the head" should Wesler try to enter the house uninvited during the weekend. To this suggestion, the policeman replied, "Yes, but wait until he gets in the house." (A week before this incident Shirley Hooper had noticed someone prowling around her house at night. Two days before the shooting someone had attempted to get into Ms. Hooper's bedroom and had slashed the window screen. She suspected that such person was Wesler.)

That evening, Ms. Hooper called the defendant and asked her to spend the night with her in the Hooper house. At that time she related to Ms. Wanrow the facts we have previously set forth. The defendant arrived sometime after 6 p.m. with a pistol in her handbag. The two women ultimately determined that they were too afraid to stay alone and decided to ask some friends to come over for added protection. The two women then called the defendant's sister and brother–in–law, Angie and Chuck Michel. The four

adults did not go to bed that evening, but remained awake talking and watching for any possible prowlers. There were eight young children in the house with them. At around 5 a.m., Chuck Michel, without the knowledge of the women in the house, went to Wesler's house, carrying a baseball bat. Upon arriving at the Wesler residence, Mr. Michel accused Wesler of molesting little children. Mr. Wesler then suggested that they go over to the Hooper residence and get the whole thing straightened out. Another man, one David Kelly, was also present, and together the three men went over to the Hooper house. Mr. Michel and Mr. Kelly remained outside while Wesler entered the residence.

The testimony as to what next took place is considerably less precise. It appears that Wesler, a large man who was visibly intoxicated, entered the home and when told to leave declined to do so. A good deal of shouting and confusion then arose, and a young child, asleep on the couch, awoke crying. The testimony indicates that Wesler then approached this child, stating, "My what a cute little boy," or words to that effect, and that the child's mother, Ms. Michel, stepped between Wesler and the child. By this time Hooper was screaming for Wesler to get out. Ms. Wanrow, a 5-foot 4-inch woman who at the time had a broken leg and was using a crutch, testified that she then went to the front door to enlist the aid of Chuck Michel. She stated that she shouted for him and, upon turning around to reenter the living room, found Wesler standing directly behind her. She testified to being gravely startled by this situation and to having then shot Wesler in what amounted to a reflex action.

After Wesler was shot, Ms. Hooper called the police via a Spokane crime check emergency phone number, stating, "There's a guy broke in, and my girlfriend shot him." The defendant later took the phone and engaged in a conversation with the police operator. The entire conversation was tape recorded.

At trial, over defense counsel's objection, the tape was admitted into evidence. After presentation of the evidence,

the jury was instructed on the law and commenced deliberations. Deliberations progressed for a time, and the jurors requested to hear the tape again. The request was granted. Not long after reviewing the tape, the jury reached its verdict of guilty as to both counts. The State, on review, asserts that no reversible error was committed in admitting the tape recording.

RCW 9.73.030(1) provides that it is unlawful for a political subdivision of the state, among others, to record a "private communication" between two or more individuals without first obtaining the consent of all participants.[1] RCW 9.73.050 makes any information obtained in violation of RCW 9.73.030 inadmissible in a civil or criminal case.[2] RCW 9.73.090(1) creates an exception to these general rules. It allows police personnel to record incoming telephone calls for the purpose of verifying the accuracy of reception of emergency calls.[3]

■■ It is clear that, whatever its meaning in other contexts, the term "private communication" in RCW

---

[1] "Except as otherwise provided in this chapter, it shall be unlawful for any individual, partnership, corporation, association, or the state of Washington, its agencies, and political subdivisions to intercept, record or divulge any:

"(1) Private communication transmitted by telephone, telegraph, radio, or other device between two or more individuals between points within or without the state by any device electronic or otherwise designed to record and/or transmit said communication regardless how such device is powered or actuated, without first obtaining the consent of all the participants in the communication;". RCW 9.73.030(1).

[2] "Any information obtained in violation of RCW 9.73.030 or pursuant to any order issued under the provisions of RCW 9.73.040 shall be inadmissible in any civil or criminal case in all courts of general or limited jurisdiction in this state, except with the permission of the person whose rights have been violated in an action brought for damages under the provisions of RCW 9.73.030 through 9.73-.080, or in a criminal action in which the defendant is charged with a crime, the commission of which would jeopardize national security." RCW 9.73.050.

[3] "The provisions of RCW 9.73.030 through 9.73.080 shall not apply to police and fire personnel in the following instances:

"(1) Recording incoming telephone calls to police and fire stations for the purpose and only for the purpose of verifying the accuracy of reception of emergency calls." RCW 9.73.090(1).

9.73.030(1) encompasses an incoming telephone call to a police station and thus includes the respondent's conversation with the police operator. While no definition of the phrase is contained in the privacy statutes, reference to other parts of the statutory scheme demonstrate the legislature's intent in using that term. Words in a statute take their meaning from the context in which they are used. *State ex rel. Kadow v. Board of Adjustment,* 77 Wn.2d 587, 591, 464 P.2d 418 (1970).

In RCW 9.73.090(1) the legislature excluded certain "incoming telephone calls to police and fire stations" from the operation of RCW 9.73.030. There would be no purpose in enacting this exclusion unless the legislature believed such communications were otherwise within the scope of the section. It is presumed that the legislature does not engage in unnecessary or meaningless acts. *Knowles v. Holly,* 82 Wn.2d 694, 513 P.2d 18 (1973). Consequently, to interpret the privacy statute so that no portion of it is superfluous or insignificant, *see Snow's Mobile Homes, Inc. v. Morgan,* 80 Wn.2d 283, 288, 494 P.2d 216 (1972), we must conclude that such telephone calls would fall within RCW 9.73.030(1) but for their exclusion by RCW 9.73.090.

This analysis is identical to that employed by this court on previous occasions. In *Monroe Calculating Mach. Co. v. Department of Labor & Indus.,* 11 Wn.2d 636, 643–44, 120 P.2d 466 (1941), the scope of the statutory phrase "power-driven machinery" was at issue. A proviso excluded specified machines from the meaning of the term. The court concluded "[t]he legislature must have assumed that the items listed in the proviso were otherwise included within the scope of the enumerated extrahazardous employments, making these exceptions necessary in order to prevent these particular activities from coming within the act." Similarly, in *Roza Irrigation Dist. v. State,* 80 Wn.2d 633, 641, 497 P.2d 166 (1972), we stated, "[l]ogically . . . a term which is restricted by an exception must have been used with the understanding that it was broad enough to include the exception, else engrafting the exception would have been an

unnecessary and meaningless act." These cases reassert the principle most clearly enunciated in *McKenzie v. Mukilteo Water Dist.*, 4 Wn.2d 103, 114, 102 P.2d 251 (1940), wherein this court observed:

"Most frequently perhaps a proviso is intended to restrain the preceding provisions and to except something that would otherwise have been within the act. Where this is the purpose of a proviso, the general language of the main provisions is to be construed as covering the matters contained in the proviso had those provisions stood alone." 25 R. C. L. 987, § 233.

"It has not been an unfrequent mode of legislation to frame an act with general language in the enacting clause, and to restrict its operation by a proviso. . . . Provisos and exceptions are similar; intended to restrain the enacting clause; to except something which would otherwise be within it, or in some manner to modify it. . . . The exception of a particular thing from the operation of the general words of a statute shows that in the opinion of the law–maker the thing excepted would be within the general words had not the exception been made." 2 Lewis' Sutherland Statutory Construction (2d ed.), 670, § 351.

See, also, Black on Interpretation of Laws (2d ed.), 430, § 129.

Employing the same logic here, the term "private communication" in RCW 9.73.030(1) must have been used by the legislature in a sense which encompasses "incoming telephone calls to police and fire stations." (RCW 9.73.090(1).) *See State v. Grant*, 9 Wn. App. 260, 511 P.2d 1013 (1973). Thus, under RCW 9.73.030, the recording of respondent's conversation by the police without first obtaining her consent was unlawful and, under RCW 9.73.050, is inadmissible in court *unless* it falls within an exception to these provisions.

The exceptions provided by the legislature relevant to the issue under consideration are set forth in RCW 9.73.090 which reads as follows:

The provisions of RCW 9.73.030 through 9.73.080 shall not apply to police and fire personnel in the following instances:

(1) Recording incoming telephone calls to police and fire stations for the purpose and only for the purpose of verifying the accuracy of reception of emergency calls.

(2) Video and/or sound recordings may be made of arrested persons by police officers responsible for making arrests or holding persons in custody before their first appearance in court. Such video and/or sound recordings shall conform strictly to the following:

(a) the arrested person shall be informed that such recording is being made and the statement so informing him shall be included in the recording,

(b) the recording shall commence with an indication of the time of the beginning thereof and terminate with an indication of the time thereof,

(c) at the commencement of the recording the arrested person shall be fully informed of his constitutional rights, and such statements informing him shall be included in the recording,

(d) the recordings shall only be used for valid police or court activities.

The State contends RCW 9.73.090(1) allows the use of a recording of an "emergency call" as evidence in a criminal case. The plain wording of the statute and the legislative history compel a contrary conclusion. The first portion of section .090 states that the provisions of the act concerning the necessity for consent (.030), or court order (.040), for lawful recording; the inadmissibility of recordings in evidence (.050); and civil (.060) and criminal sanctions (.080) for violation of the act, shall not apply in certain instances. The two instances then set forth are each, in themselves, subject to specific limitations contained within each subsection.

The cases previously discussed, which delineate the role of an exception or proviso are equally applicable here. To conclude that a statutory exception is not to be given effect because to do so renders superfluous a portion of the general language which the exception is designed to restrict, would result in a conclusion that nearly all exceptions or provisos engrafted upon general statutes are of no force and

effect, and seriously alters our previously stated rules of statutory construction.

The language "for the purpose and only for the purpose of verifying the accuracy of reception of emergency calls" contained within RCW 9.73.090(1), by its plain meaning, adds a strict limitation upon the *purpose* for which a recording may be used which is permissible under the general exception set forth in the opening portion of .090. Subsection (1) of section .090 makes no provision for the use of recordings of emergency calls in judicial proceedings. Rather, while it does permit such recordings, it limits their use to one purpose and one purpose only—verification of emergency information.

Subsection (2), however, pertains to video and/or sound recordings of arrested persons and expressly authorizes their use in court, but only when the person has been informed that a recording is being made and other requirements set forth in that subsection have been met. Just as in the case of subsection (1), subsection (2) provides limitations upon the broad statement of exemption set forth in the first portion of section .090. The distinction between the two subsections strongly indicates the legislature did not intend recordings made under subsection (1) to be available for use in court. Such a use is inconsistent with the careful wording of subsection (1). This view is also bolstered by RCW 9.73.100[4] which expressly anticipates the use of "video and/or sound recordings" in court, but makes no mention of recordings of emergency "incoming telephone calls."

In RCW 9.73.090(2) the legislature has clearly expressed its policy determination that the use of recordings in the criminal process "shall conform strictly" to specified procedures for the protection of the privacy of the

---

[4]"Video and/or sound recordings obtained by police personnel under the authority of RCW 9.73.090 and 9.73.100 shall be made available for hearing and/or viewing by defense counsel at the request of defense counsel whenever a criminal charge has been filed against the subject of the video and/or sound recordings." RCW 9.73.100.

citizen and the defendant. Courts do not review the wisdom of such legislative judgments. *Petstel, Inc. v. King County,* 77 Wn.2d 144, 151, 459 P.2d 937 (1969); *Treffry v. Taylor,* 67 Wn.2d 487, 408 P.2d 269 (1965).

The first portion of RCW 9.73.090 is not rendered superfluous by the specific language of either subsection (1) or (2). In each instance the language employed simply refines and narrows, for a specific purpose, the general exception with which the section begins. The phrase "for the purpose and only for the purpose" was not inserted solely to limit the police to recording the incoming *emergency* calls, as this construction does not explain the use of the words "verifying the accuracy of reception". If this had been the purpose, the legislature could have accomplished it simply by excluding from RCW 9.73.030 the recording of incoming emergency calls. We must give effect to all the language of the statute.[5]

■ Exceptions are, as a general rule, to be strictly construed and allowed to extend only so far as their language warrants. *State v. Wright,* 84 Wn.2d 645, 529 P.2d 453 (1974); *State v. Christensen,* 18 Wn.2d 7, 137 P.2d 512, 146 A.L.R. 1302 (1943). The exception means just what it says—it was granted only to insure accuracy.

Any argument that the sole purpose of RCW 9.73.050 is to deter the intercepting and recording of private communications is unwarranted. The activity permitted under this exception is very limited. This is evident from the language of RCW 9.73.090(1) itself and its legislative history. Senator Andersen, a cosponsor of the provision, described this narrow use during legislative debate:

I do not think that they should have these things recorded when the people do not know they are being recorded. The point is that they are trying to make sure

---

[5]The Court of Appeals concluded that admitting the recorded conversation into evidence here "emasculates the prohibition of RCW 9.73.050 and makes the limited purpose of the recording a sham." *State v. Wanrow,* 14 Wn. App. 115, 118, 538 P.2d 849 (1975). *See also State v. Smith,* 85 Wn.2d 840, 857, 540 P.2d 424 (1975) (Utter, J., dissenting).

that they get the right address when they have a call to a robbery or they get the right address and so forth when a call comes in that the house is on fire . . .

Senate Journal, 41st Legislature (1970), at 205. Both the language and the history of RCW 9.73 make it clear the legislature's primary purpose in enacting these statutes was the protection of the privacy of individuals from public dissemination, even in the course of a public trial, of illegally obtained information. This purpose is best furthered by giving only limited effect to the exception contained within RCW 9.73.090(1).[6]

We hold that respondent's telephone conversation with the police operator was a "private communication" within RCW 9.73.030(1), and, since the tape recording was used for a purpose other than verification of accuracy, that it does not fall within RCW 9.73.090(1). Hence, the information obtained thereby, as well as the tape itself was, and is, inadmissible in any court. RCW 9.73.050.

There can be little question but that admission of the tape recording was prejudicial to respondent. This is evident not only from a review of the record but also from the fact that the jury was deadlocked until the tape recording was replayed in the jury room. Forty–five minutes after hearing the tape again, the jury returned its verdict of guilty.

Reversal of respondent's conviction is also required by a second serious error committed by the trial court. Instruction No. 10, setting forth the law of self–defense, incorrectly limited the jury's consideration of acts and circumstances pertinent to respondent's perception of the alleged threat to her person. An examination of the record of the testimony and of the colloquys which took place with regard to the instructions on self–defense indicate the critical importance of these instructions to the respondent's theory of the case. Based upon the evidence we have already set out, it is

---

[6]The same conclusion has been reached in a case note evaluating the Court of Appeals decision in this case. *See* 11 Gonzaga L. Rev. 792 (1976).

234

obviously crucial that the jury be precisely instructed as to the defense of justification.

In the opening paragraph of instruction No. 10, the jury, in evaluating the gravity of the danger to the respondent, was directed to consider only those acts and circumstances occurring "at or immediately before the killing . . ."[7] This is not now, and never has been, the law of self-defense in Washington. On the contrary, the justification of self–defense is to be evaluated in light of *all* the facts and circumstances known to the defendant, including those known substantially before the killing.

In *State v. Ellis*, 30 Wash. 369, 70 P. 963 (1902), this court reversed a first–degree murder conviction obtained under self–defense instructions quite similar to that in the present case. The defendant sought to show that the deceased had a reputation and habit of carrying and using deadly weapons when engaged in quarrels. The trial court instructed that threats were insufficient justification unless "'at the time of the alleged killing the deceased was making or immediately preceding the killing had committed some overt act . . .'" *State v. Ellis, supra* at 371. This court found the instruction "defective and misleading", stating "the apparent facts should all be taken together to illustrate the motives and good faith of the defendant . . ." *State v. Ellis, supra* at 374.

---

[7]Instruction No. 10 reads:

"To justify killing in self–defense, there need be no actual or real danger to the life or person of the party killing, but thére must be, or reasonably appear to be, at or immediately before the killing, some overt act, or some circumstances which would reasonably indicate to the party killing that the person slain, is, at the time, endeavoring to kill him or inflict upon him great bodily harm.

"However, when there is no reasonable ground for the person attacked to believe that his person is in imminent danger of death or great bodily harm, and it appears to him that only an ordinary battery is all that is intended, and all that he has reasonable grounds to fear from his assailant, he has a right to stand his ground and repel such threatened assault, yet he has no right to repel a threatened assault with naked hands, by the use of a deadly weapon in a deadly manner, unless he believes, and has reasonable grounds to believe, that he is in imminent danger of death or great bodily harm."

> [I]t is apparent that a man who habitually carries and uses such weapons in quarrels must cause greater apprehension of danger than one who does not bear such reputation . . . The vital question is the reasonableness of the defendant's apprehension of danger . . . The jury are [*sic*] entitled to stand as nearly as practicable in the shoes of defendant, and from this point of view determine the character of the act.

*State v. Ellis, supra* at 373. Thus, circumstances predating the killing by weeks and months were deemed entirely proper, and in fact essential, to a proper disposition of the claim of self–defense.

Similarly, in *State v. Churchill*, 52 Wash. 210, 100 P. 309 (1909), the court upheld self–defense instructions directing the jury to consider all relevant facts and circumstances, including those preceding the homicide. The trial court's instructions referred to an overt act of the person killed "'at or immediately before the killing . . .' which, either by itself, or coupled with words, facts or circumstances, *then or theretofore occurring*,'" may establish a reasonable belief of imminent danger. (Italics ours.) *State v. Churchill, supra* at 219. The instruction further requested the jury to "'take into consideration *all* the facts and circumstances bearing on the question and surrounding defendant and existing at *or prior to the time of the alleged shooting* . . .'" (Italics ours.) *State v. Churchill, supra* at 220. This court found these instructions "clear, apt, and comprehensive" and free from error. *State v. Churchill, supra* at 225.

*State v. Tribett*, 74 Wash. 125, 132 P. 875 (1913), is in accord. There this court approved an instruction which twice directed the jury to evaluate the reasonableness of the defendant's actions in defense of himself "'in the light of all the circumstances'." *State v. Tribett, supra* at 130. Such circumstances included those existing and known long before the killing, such as the reputation of the place of the killing for lawlessness. This court stated with reference to the self–defense instruction:

> All of these facts and circumstances should have been placed before the jury, to the end that they could put

themselves in the place of the appellant, get the point of view which he had at the time of the tragedy, and view the conduct of the [deceased] with all its pertinent sidelights as the appellant was warranted in viewing it. In no other way could the jury safely say what a reasonably prudent man similarly situated would have done.

*State v. Tribett, supra* at 130. The rule firmly established by these cases has never been disapproved and is still followed today. "It is clear the jury is entitled to consider *all* of the circumstances surrounding the incident in determining whether [the] defendant had reasonable grounds to believe grievous bodily harm was about to be inflicted." *State v. Lewis,* 6 Wn. App. 38, 41, 491 P.2d 1062 (1971). By limiting the jury's consideration of the surrounding acts and circumstances to those occurring "at or immediately before the killing," instruction No. 10 in the present case was an erroneous statement of the applicable law on the critical focal point of the defendant's case.

█ The State attempts to minimize this deficiency in instruction No. 10 by invoking the rule that an instruction is "sufficient" if counsel may satisfactorily argue his or her theory of the case. This is a mistaken application of the rule and will cause widespread mischief in civil as well as criminal cases if adopted here. The test of "sufficiency" is just that, and is not a rule to be applied where the instruction is an *erroneous* statement of the law. This distinction is apparent from *Smith v. McDaniel,* 53 Wn.2d 604, 335 P.2d 582 (1959), a negligence case in which the test was first enunciated. In *Smith* the appellant objected to the trial court's refusal to give a proposed instruction on the duty of care. The trial court had given other instructions which accurately expressed the duty of care, but which did not include the specific words desired by appellant. This court rejected appellant's argument since he could argue his theory of negligence from instructions which were an accurate statement of the applicable law. The test of sufficiency was next applied in a very similar case, *Short v. Hoge,* 58 Wn.2d 50, 55, 360 P.2d 565 (1961), in which this court first

found that the instructions given "accurately stated the law relative to negligence *per se,*" and then inquired as to whether counsel could satisfactorily argue his theory of negligence. Thus, the test of an instruction's sufficiency is an additional safeguard to be applied only where the instruction given is first found to be an accurate statement of the law. Furthermore, it would be illogical to apply such a test to erroneous instructions—of what significance is it that counsel may or may not be able to argue his theory to the jury when the jury has been misinformed about the law to be applied?

■ More importantly, there is a test for reviewing instructions that is clearly designed for and consistently applied to cases in which the instruction given is an erroneous statement of the law.

> When the record discloses *an error in an instruction* given on behalf of the party in whose favor the verdict was returned, the error is *presumed to have been prejudicial,* and to furnish ground for reversal, unless it affirmatively appears that it was harmless. . . .
>
> A harmless error is an error which is *trivial,* or *formal,* or *merely academic,* and was not prejudicial to the substantial rights of the party assigning it, and *in no way affected the final outcome of the case.*

(Italics ours.) *State v. Golladay,* 78 Wn.2d 121, 139, 470 P.2d 191 (1970) *quoting State v. Britton,* 27 Wn.2d 336, 341, 178 P.2d 341 (1947); *accord, State v. Martin,* 73 Wn.2d 616, 627, 440 P.2d 429 (1968); *State v. Odom,* 8 Wn. App. 180, 188, 504 P.2d 1186 (1973); *State v. Rogers,* 5 Wn. App. 347, 352, 486 P.2d 1125 (1971); *State v. Johnson,* 1 Wn. App. 553, 463 P.2d 205 (1969).

As shown by the discussion above, instruction No. 10 erred in limiting the acts and circumstances which the jury could consider in evaluating the nature of the threat of harm as perceived by respondent. Under the well–established rule, this error is presumed to have been prejudicial. Moreover, far from affirmatively showing that the error was harmless, the record demonstrates the limitation to circumstances "at or immediately before the killing" was of

crucial importance in the present case. Respondent's knowledge of the victim's reputation for aggressive acts was gained many hours before the killing and was based upon events which occurred over a period of years. Under the law of this state, the jury should have been allowed to consider this information in making the critical determination of the "'degree of force which . . . a reasonable person in the same situation . . . seeing what [s]he sees and knowing what [s]he knows, then would believe to be necessary.'" *State v. Dunning,* 8 Wn. App. 340, 342, 506 P.2d 321 (1973); *see State v. Hill,* 76 Wn.2d 557, 458 P.2d 171 (1969); *State v. Tyree,* 143 Wash. 313, 255 P. 382 (1927); *State v. Miller,* 141 Wash. 104, 250 P. 645 (1926).

Instruction No. 10 also may not be salvaged by asserting any deficiency in it to have been cured by instruction No. 12, through reliance upon the general rule that, if the instructions, when considered as a whole, properly state the law, they are sufficient. The only language in instruction No. 12 which could conceivably be viewed as curing the defect in instruction No. 10 informs the jury that they may "consider the words and actions of the deceased prior to the homicide . . . together with any and all factors which in your judgment may bear upon [self–defense]." This language does not cure the statements in instruction No. 10 which are here challenged. At best, the two instructions are inconsistent, instruction No. 10 containing a patent misstatement of the law applicable to the defendant's theory of the case.

Our decisions in *State v. Stafford,* 44 Wn.2d 353, 267 P.2d 699 (1954), *State v. Refsnes,* 14 Wn.2d 569, 128 P.2d 773 (1942), and *State v. Smith,* 196 Wash. 534, 83 P.2d 749 (1938), do not support use of the rule requiring consideration of the instructions as a whole in this case. In *Stafford,* the rule was invoked in a situation where one instruction was found to properly state the law, while another, under a "strained construction" *might* have misled the jury. In *Refsnes,* the court expressly held the instruction there challenged to be a correct statement of the law and that, in

any event, error in the instruction had been waived. In *Smith*, the court again approves the challenged instruction and then holds that even if it were assumed to be "somewhat inadequate", other instructions fully explained the applicable law.

When instructions are inconsistent, it is the duty of the reviewing court to determine whether "the jury was misled as to its function and responsibilities under the law" by that inconsistency. *State v. Hayes*, 73 Wn.2d 568, 572, 439 P.2d 978 (1968); *State v. La Porte*, 58 Wn.2d 816, 365 P.2d 24 (1961). *See State v. Lewis*, 6 Wn. App. 38, 491 P.2d 1062 (1971). It follows from the cases previously cited, that where such an inconsistency is the result of a clear misstatement of the law, the misstatement must be presumed to have misled the jury in a manner prejudicial to the defendant.

The second paragraph of instruction No. 10 contains an equally erroneous and prejudicial statement of the law. That portion of the instruction reads:

> However, when there is no reasonable ground for the person attacked to believe that *his* person is in imminent danger of death or great bodily harm, and it appears to *him* that only an ordinary battery is all that is intended, and all that *he* has reasonable grounds to fear from *his* assailant, *he* has a right to stand *his* ground and repel such threatened assault, yet *he* has no right to repel a threatened assault with naked hands, by the use of a deadly weapon in a deadly manner, unless *he* believes, *and has reasonable grounds* to believe, that *he* is in imminent danger of death or great bodily harm.

(Italics ours.) In our society women suffer from a conspicuous lack of access to training in and the means of developing those skills necessary to effectively repel a male assailant without resorting to the use of deadly weapons.[8] Instruction No. 12 does indicate that the "relative size and

---

[8] *See* B. Babcock, A. Freedman, E. Norton & S. Ross, *Sex Discrimination and the Law: Causes and Remedies* 943–1070 (1975); S. Brownmiller, *Against our Will: Men, Women and Rape* (1975).

strength of the persons involved" may be considered; however, it does not make clear that the defendant's actions are to be judged against her own subjective impressions and not those which a detached jury might determine to be objectively reasonable. *State v. Miller, supra; State v. Tyree, supra; State v. Dunning, supra.* The applicable rule of law is clearly stated in *Miller* at page 105:

If the appellants, at the time of the alleged assault upon them, as reasonably and ordinarily cautious and prudent men, honestly believed that they were in danger of great bodily harm, they would have the right to resort to self defense, and their conduct is to be judged by the condition appearing to them at the time, not by the condition as it might appear to the jury in the light of testimony before it.

The second paragraph of instruction No. 10 not only establishes an objective standard, but through the persistent use of the masculine gender leaves the jury with the impression the objective standard to be applied is that applicable to an altercation between two men. The impression created—that a 5–foot 4–inch woman with a cast on her leg and using a crutch must, under the law, somehow repel an assault by a 6–foot 2–inch intoxicated man without employing weapons in her defense, unless the jury finds her determination of the degree of danger to be objectively reasonable—constitutes a separate and distinct misstatement of the law and, in the context of this case, violates the respondent's right to equal protection of the law. The respondent was entitled to have the jury consider her actions in the light of her own perceptions of the situation, including those perceptions which were the product of our nation's "long and unfortunate history of sex discrimination." *Frontiero v. Richardson,* 411 U.S. 677, 684, 36 L. Ed. 2d 583, 93 S. Ct. 1764 (1973). Until such time as the effects of that history are eradicated, care must be taken to assure that our self–defense instructions afford women the right to have their conduct judged in light of the individual physical handicaps which are the product of sex discrimination. To fail to do so is to deny the right of the individual woman

involved to trial by the same rules which are applicable to male defendants. *See Lamb v. Brown,* 456 F.2d 18 (10th Cir. 1972); *see also Reed v. Reed,* 404 U.S. 71, 30 L. Ed. 2d 225, 92 S. Ct. 251 (1971); *Darrin v. Gould,* 85 Wn.2d 859, 540 P.2d 882 (1975). The portion of the instruction above quoted misstates our law in creating an objective standard of "reasonableness." It then compounds that error by utilizing language suggesting that the respondent's conduct must be measured against that of a reasonable male individual finding himself in the same circumstances.

We conclude that the instruction here in question contains an improper statement of the law on a vital issue in the case, is inconsistent, misleading, and prejudicial when read in conjunction with other instructions pertaining to the same issue, and therefore is a proper basis for a finding of reversible error.

Finally, we agree with the conclusion of the Court of Appeals that the trial court cannot be said to have abused its discretion in this case in declining to allow defendant's counsel to call an expert witness to present opinion evidence on the effects of defendant's Indian culture upon her perception and actions. We also find the remaining contentions advanced by the respondent in support of the reversal of her conviction to be without merit.

In light of the errors in admission of evidence and instruction of the jury, the decision of the Court of Appeals is affirmed, the conviction reversed, and the case remanded for a new trial.

HUNTER, BRACHTENBACH, and HOROWITZ, JJ., concur.

WRIGHT, J. (concurring)—I concur with the result reached by the majority for only *one* of the reasons stated therein.

Were it not for the language of the statute, RCW 9.73-.030 through .090, I would agree that the telephone call here is not a "private conversation." A careful reading of

the statute, however, compels a different result. The legislature clearly intended to classify such telephone calls as "private conversations," otherwise the exception contained in RCW 9.73.090(1) would be meaningless and surplusage.

Based upon the clear legislative intent and upon the reasoning fully set out in the opinion as to that *one* issue, I concur in the result.

HAMILTON, J. (dissenting)—I dissent, for I believe the tape recording was properly admitted under RCW 9.73.090(1). I also do not feel that the jury instructions were so prejudicial that a new trial must be granted.

The majority states that the words in RCW 9.73.090(1) "for the purpose and only for the purpose of verifying the accuracy of reception of emergency calls" restrict the recording's use to verification only; therefore, these emergency recordings are still inadmissible under RCW 9.73.050. I disagree. This interpretation of RCW 9.73.090(1) completely ignores the first portion of RCW 9.73.090, which opens with a waiver of RCW 9.73.030 through RCW 9.73.080,[9] *i.e.*, the recording is not unlawful under RCW 9.73.030; there is no need to procure a court order permitting interception under RCW 9.73.040; the information obtained is not inadmissible in any civil or criminal case under RCW 9.73.050; there is no civil liability under RCW 9.73.060; and, there is no criminal liability under RCW 9.73.080. It is an established rule of statutory construction that courts are obliged to interpret a statute, if possible, so that no portion of it is superfluous, void, or insignificant. *Snow's Mobile Homes, Inc. v. Morgan,* 80 Wn.2d 283, 494 P.2d 216 (1972); *Des Moines v. Hemenway,* 73 Wn.2d 130, 437 P.2d 171 (1968). Interpreting the words "for the purpose and only for the purpose of verifying the accuracy of

_____

[9]The first sentence of RCW 9.73.090 begins with: "The provisions of RCW 9.73.030 through 9.73.080 shall not apply to police and fire personnel in the following instances:".

reception of emergency calls" as reinstating the exclusionary rule of RCW 9.73.050 renders void and superfluous the first portion of RCW 9.73.090 insofar as it pertains to waiving RCW 9.73.050.

The majority states that the distinction between subsections (1) and (2) of RCW 9.73.090 strongly indicates that "the legislature did not intend recordings made under subsection (1) to be available for use in court." I do not believe this distinction indicates any such legislative intent. Subsection (2) deals with video and/or sound recordings of *arrested persons.* By their very nature these recordings are made for use in court against the arrested person, and strict guidelines must be set down for the protection of the arrested person. On the other hand, recordings of emergency phone calls under subsection (1) are not made with the specific objective of using them in court. Thus, there is no need for the strict guidelines set out in subsection (2). In finding legislative intent from the absence of strict guidelines in subsection (1), the majority ignores the basic difference between the recording of an emergency call for the purpose of verifying the accuracy of information received, and the video and/or sound recording of an arrested person for the purpose of using such a recording as evidence in a court proceeding.

The majority reads the words "for the purpose and only for the purpose of verifying the accuracy of reception of emergency calls" as strictly limiting the *use* which may be made of the recording of the emergency phone call, *i.e.*, it can only be used to verify information and cannot be used in a court proceeding. RCW 9.73.090(1) does not speak of uses; rather, it speaks of purposes. I read RCW 9.73.090(1) as waiving the exclusionary rule of RCW 9.73.050, if the purpose of recording the emergency call was to verify the accuracy of the information received. Once it is determined that the police have recorded the emergency call for the proper purpose, then RCW 9.73.030 through RCW 9.73.080 do not apply, and the tape recording is admissible in a judicial proceeding.

Further, exclusionary rules operate in derogation of a court's primary function of determining truth and are adopted by courts and legislatures to further some societal interest deemed of greater importance than seeking truth. I believe the legislature enacted the exclusionary rule of RCW 9.73.050 as an additional deterrent to the intercepting and recording of private communications or conversations.[10] Courts have long recognized that subjecting police officials to criminal or civil liability does not always deter them from improperly obtaining evidence. Because police officials may not be so deterred, courts have resorted to the exclusionary rule to deter them from improperly obtaining evidence. *See Michigan v. Tucker,* 417 U.S. 433, 41 L. Ed. 2d 182, 94 S. Ct. 2357 (1974); *Mapp v. Ohio,* 367 U.S. 643, 6 L. Ed. 2d 1081, 81 S. Ct. 1684, 84 A.L.R.2d 933 (1961); *People v. Cahan,* 44 Cal. 2d 434, 282 P.2d 905 (1955); and *State v. McFarland,* 84 Wn.2d 391, 526 P.2d 361 (1974). No one can doubt the propriety of recording emergency calls to verify the accuracy of the relayed information. Persons calling in may only be able to give information once, and it is extremely important that police and fire personnel receive the correct information so as to deal with the emergency as quickly as possible. The legislature saw no reason to deter the recording of emergency telephone calls and therefore removed the sanctions of RCW 9.73.050, RCW 9.73.060, and RCW 9.73.080 to recording emergency telephone calls, when the purpose of such a recording was to verify the accuracy of the information received.

My interpretation of RCW 9.73.090(1) does not mean that all conversations and all parts of conversations recorded pursuant to RCW 9.73.090(1) will be admissible. By the terms of the statute, the phone calls must be

---

[10]The other deterrents to intercepting and recording private communications are found in RCW 9.73.060 and RCW 9.73.080. RCW 9.73.060 provides for civil liability for any person who, directly or by means of a detective agency or any other agent, violates RCW 9.73.030. RCW 9.73.080 provides for criminal liability for any person who violates RCW 9.73.030.

incoming and relating to an emergency, and the police must be recording the call for emergency purposes. If police or fire personnel use the emergency call to gather investigatory information or to interrogate a suspected defendant, the tape recording of that emergency call will lose its immunity under RCW 9.73.090(1) and will be inadmissible into evidence under RCW 9.73.050.

With the above requirements in mind, I turn to the facts in this case. After the defendant shot Mr. Wesler, she also fired a few more shots, one of which struck David Kelly in the arm. He immediately fled from the house. Immediately after the shootings, Ms. Hooper called the police, using the police crime check emergency number. After she reported the facts, Ms. Hooper was told by the police operator to stay on the line. At this point, the defendant took the phone from Ms. Hooper. The police operator did not ask to talk to the person who did the shooting. Rather, the defendant's taking of the telephone was a purely voluntary act done at the instigation of Ms. Hooper. This kept the status of this communication as an incoming emergency call.

Later in the conversation the defendant became anxious about remaining on the line and communicated to the police operator her desire to terminate the conversation. The operator told her to stay on the line. At this point in the conversation, the police operator had dispatched a police prowl car and ambulance to the scene. He knew that the defendant had a gun and that two people had been shot, one inside the house and one outside who possibly was coming back armed with a weapon. It was very important for the police operator to stabilize the situation at Ms. Hooper's house. If the police operator had allowed the defendant to leave the phone, the police officers coming to the scene would have approached the house with one armed person inside the house, obviously frightened and nervous. The approaching officers would also have had no knowledge as to whether the wounded person outside had made any attempts to reenter the house. I believe it was imperative

that the police operator keep the defendant on the phone line for the protection of the approaching police officers, the defendant, the other occupants of Ms. Hooper's house, and the wounded person who could have been somewhere in the vicinity. The entire phone communication indicates an intent on the part of the police operator to keep the communication line open and to stabilize the situation so that more people were not hurt. He made no overt attempt to interrogate the defendant or to gather incriminating information. Under my interpretation of RCW 9.73.090(1), the whole communication falls within the emergency immunity of RCW 9.73.090(1), and the trial court committed no error by admitting the tape recording of the communication into evidence.

I also do not believe that the defendant is entitled to a new trial because of the jury instructions. Although instruction No. 10 did not direct the jury to consider *all of the surrounding circumstances, see State v. Miller,* 141 Wash. 104, 250 P. 645 (1926), and *State v. Lewis,* 6 Wn. App. 38, 491 P.2d 1062 (1971), this deficiency was corrected by the giving of instruction No. 12.[11] Instructions must be considered as a whole and if, when so considered, they properly state the law, they are sufficient. *See State v. Stafford,* 44 Wn.2d 353, 355, 267 P.2d 699 (1954); *State v. Refsnes,* 14 Wn.2d 569, 572, 128 P.2d 773 (1942); *State v. Smith,* 196 Wash. 534, 83 P.2d 749 (1938). The trial court instructed the jury to "consider the instructions as a whole and . . . not place undue emphasis on any particular instruction or part thereof." In my view, the instructions were not so prejudicial so as to require a new trial for the defendant.

---

[11]Instruction No. 12 reads:

"In connection with the defense of justification, you are instructed that you may consider the words and actions of the deceased prior to the homicide, the relative size and strength of the persons involved, *together with any and all factors which in your judgment may bear upon your determination as to whether the defendant reasonably believed herself in danger of grievous bodily harm at the time in question.* But a person who is attacked has no right to use greater

For the above reasons, I would conclude that the defendant received a fair trial and that the decision of the Court of Appeals should be reversed and the judgment of the trial court upon the jury verdict reinstated.

STAFFORD, C.J., and ROSELLINI, J., concur with HAMILTON, J.

Petition for rehearing denied April 5, 1977.

force than he or she honestly believes is necessary, or has reasonable grounds to believe is necessary for self–defense.

"There is no legal justification or excuse for a private person to deliberately assault another as a result of anger or to inflict vengeance."