[No. 50546-7-I. Division One. May 19, 2003.]

LEONIDA DEL ROSARIO, *Respondent*, v. GENE DEL ROSARIO, ET AL., *Appellants*.

---

888

*Marilee C. Erickson* (of *Reed McClure*) and *David H. Middleton*, for appellants.

*Leslie O. Stomsvik*; *Terry E. Lumsden*; and *Howard M. Goodfriend* (of *Edwards Sieh Smith & Goodfriend, P.S.*), for respondent.

COLEMAN, J. — Leonida Del Rosario signed a release of personal injury claims against Gene and Priscilla Del Rosario in exchange for an insurance settlement. She later sought to avoid the release because at the time she signed it, she thought it concerned only lost wages. A jury awarded Leonida additional damages after the trial court instructed them that a release may be avoided if it was not "fairly and knowingly made." We hold that the trial court erred in using that standard instead of traditional contract principles. The "fairly and knowingly made" standard applies only in cases involving unknown injuries, which were not at issue here. But given the evidence presented at trial, a reasonable juror could find that Leonida, who does not understand English, reasonably relied on Priscilla's erroneous explanation of the release. Accordingly, Gene and Priscilla are not entitled to judgment as a matter of law

under traditional contract principles. We remand the case for a new trial with jury instructions that accurately reflect the proper standard for avoiding a contract.

## FACTS

Leonida Del Rosario sustained injuries while riding in a car driven by her brother-in-law, Gene Del Rosario. Gene was at fault. Gene's wife, Priscilla, and Gene's brother and sister were also riding in the car at the time.

Gene was insured by State Farm Mutual Automobile Insurance Company. Two days after the accident, State Farm sent a letter to Leonida with information regarding payment for her lost wages and medical bills, as well as an application for personal injury protection (PIP) benefits. Leonida's daughter read the letter and explained it to Leonida, who cannot read or understand English and relies on her daughter to read mail and pay bills. Leonida's daughter testified that she thought Leonida understood that the application for PIP benefits would result in payment of her lost wages and medical bills. The daughter filled out an application, Leonida signed it, and it was mailed back to State Farm.

Due to her injuries, Leonida was unable to work immediately after the accident. She told her daughter and Priscilla that she was concerned because bills were mounting and she could not work. Priscilla suggested that they go down to the insurance company and get her some money. Priscilla made an appointment with Scott Kimbro, a State Farm claims adjuster who was handling the liability claim. Leonida, Priscilla, and Gene's sister all went together to the office.

Leonida testified that she believed the purpose of the meeting was to get money for lost wages. At the meeting, Mr. Kimbro gave all three women release forms to sign. He explained the release forms, which were all identical. While he was speaking, Priscilla relayed what he was saying to Leonida in Illocano, their native dialect. According to

Leonida, Priscilla said the release was for wage loss only. Priscilla testified that she told Leonida the money was for her pain and suffering as well as wage loss. Leonida signed the release form, and State Farm wrote her a check for $2,540.

Leonida sued for personal injuries. Gene and Priscilla argued that she had released all claims. A jury returned a special verdict indicating that the release was not fairly and knowingly made and awarded Leonida $21,600 in additional damages.

## ANALYSIS

### 1. The "Fairly and Knowingly Made" Standard

Gene and Priscilla first argue that the trial court erred in applying the "fairly and knowingly made" standard to Leonida's release. They are correct. Personal injury releases are generally subject to the same rules as other contracts. The "fairly and knowingly made" standard is an exception that applies only where injuries develop after parties sign a release. Absent any evidence of unknown injuries, the trial court should not have applied that exception in this case.

■■■■ Releases are contracts. As such, the general rule is that traditional contract principles apply. *Nationwide Mut. Fire Ins. Co. v. Watson*, 120 Wn.2d 178, 187, 840 P.2d 851 (1992). "Under contract law, a release is voidable if induced by fraud, misrepresentation or overreaching or if there is clear and convincing evidence of mutual mistake." *Watson*, 120 Wn.2d at 187 (citing *Beaver v. Estate of Harris*, 67 Wn.2d 621, 409 P.2d 143 (1965)).

In *Finch v. Carlton*, 84 Wn.2d 140, 524 P.2d 898 (1974), the court announced an exception to this rule. The *Finch* court, while reaffirming the applicability of traditional contract rules to releases, concluded that in addition to the usual means of avoiding a contract, a release may sometimes be avoided "where later-discovered injuries were clearly not contemplated by the parties at the time of

release." *Finch*, 84 Wn.2d at 144. Even in such cases, however, the court does not automatically void the release, but instead looks to the circumstances of the transaction to determine whether the release was "fairly and knowingly made." *Finch*, 84 Wn.2d at 145-46.[1]

In *Bennett v. Shinoda Floral, Inc.*, 108 Wn.2d 386, 739 P.2d 648 (1987), the court emphasized that *Finch* is a narrow exception. In *Bennett*, two plaintiffs argued that even though they knew they were injured when they signed the release, the *Finch* rule should apply because they failed to appreciate the full extent of their injuries until later. *Bennett*, 108 Wn.2d at 394. The court examined two competing policies to be considered in determining the voidability of releases: "On one hand, the law favors the just compensation of accident victims. On the other hand, the law favors the private settlement of disputes and gives releases great weight in order to support the finality of such settlements." *Bennett*, 108 Wn.2d at 394-95 (citation omitted) (citing *Finch*, 84 Wn.2d at 145). The court held that plaintiffs who settle claims knowing they are injured assume the risk that their injuries will worsen. *Bennett*, 108 Wn.2d at 395. The court reasoned that the policies favoring finality of settlements required a narrow reading of *Finch*:

> In summary, we conclude that the balance between the policies favoring private, final settlement and the just compensation of accident victims can be properly maintained only if the *Finch* test is limited to its facts. We hold, therefore, that the *Finch* test applies only to situations where there is no known injury at the time the release is executed.

*Bennett*, 108 Wn.2d at 396. Having determined that the *Finch* test did not apply, the *Bennett* court proceeded to

---

[1] In determining whether a release was fairly and knowingly made, courts are guided by " '(1) the peculiar dignity and protection to which the law cloaks the human person, as contrasted with articles of commerce; (2) the inequality of the bargaining positions and relative intelligence of the contracting parties; (3) the amount of consideration received; (4) the likelihood of inadequate knowledge concerning future consequences of present injury to the human body and brain; and (5) the haste, or lack thereof, with which release was obtained.' " *Finch*, 84 Wn.2d at 146 (quoting *Finch v. Carlton*, 10 Wn. App. 32, 39, 516 P.2d 212 (1973) (McInturff, J., dissenting)).

apply traditional contract principles to the releases in question and concluded that the plaintiffs could not avoid the releases. *Bennett*, 108 Wn.2d at 396.

In *Nevue v. Close*, 123 Wn.2d 253, 867 P.2d 635 (1994), the court retreated somewhat from the restrictive language it used in *Bennett*:

> *Bennett* has been criticized. The Corbin treatise concludes it is wrong. A law review article makes an extensive analysis in disapproving of the rationale and possible broad holding.
>
> . . . .
>
> . . . To paraphrase the dissent of Justice Dolliver in *Bennett*, only if the trier of fact determines that the parties specifically contemplated and bargained for the assumption of risk of future unknown injuries can the release be held to have been fairly and knowingly made as to those injuries.

*Nevue*, 123 Wn.2d at 256-58 (citation omitted). But the court explicitly declined to reject or modify either *Finch* or *Bennett*. *Nevue*, 123 Wn.2d at 256. The court merely held that the *Finch* test applies where a person knows of an injury to one part of the body but has a latent injury in another part of the body. *Nevue*, 123 Wn.2d at 258.

In determining that the *Finch* test applied in this case, the trial court relied in part on *Hooper v. Yakima County*, 79 Wn. App. 770, 904 P.2d 1193 (1995). In *Hooper*, Division Three of this court held that the plaintiff had raised an issue of fact as to whether he signed a release fairly and knowingly. *Hooper*, 79 Wn. App. at 774. The court noted Hooper was uneducated and could not understand the release. *Hooper*, 79 Wn. App. at 774. The court also reasoned that it was unlikely Hooper understood the full extent of his injuries because when he signed the release, he had received treatment only at the emergency room. *Hooper*, 79 Wn. App. at 775. The *Hooper* court apparently assumed that the *Finch* test applied to all personal injury releases:

> A release may be avoided on grounds less than those required for other contracts. Our supreme court requires that a release be fairly and knowingly made. . . .

. . . The trial court here addressed the question of mutual mistake and not the question required by *Finch*—whether the release was fairly and knowingly made.

*Hooper*, 79 Wn. App. at 773-74.

Given the language of the *Hooper* decision, it is not surprising that the trial court applied the *Finch* test in this case. Gene and Priscilla argue that *Hooper* can be distinguished on its facts because the court's decision was based in part on Hooper's inability to appreciate the extent of his injuries. *See Hooper*, 79 Wn. App. at 773-74. But that reasoning is problematic in light of *Bennett*, which held that the failure to appreciate the future consequences of known injuries is insufficient to invoke the *Finch* exception. *Bennett*, 108 Wn.2d at 395-96. Further, reading the *Hooper* decision in its entirety, it is clear that the court did not see unknown injuries as a prerequisite to the application of the *Finch* test. Instead, the court assumed that the *Finch* test applied to all releases and treated Hooper's inability to appreciate the extent of his injuries as merely one factor favoring avoidance under the *Finch* test. *See Hooper*, 79 Wn. App. at 775. *See also Finch*, 84 Wn.2d at 146 (citing " 'likelihood of inadequate knowledge concerning future consequences of present injury . . . .' " as one consideration guiding inquiry into whether release fairly and knowingly made) (quoting *Finch v. Carlton*, 10 Wn. App. 32, 39, 516 P.2d 212 (1973) (McInturff, J., dissenting)). It is therefore difficult to fault the trial court for interpreting *Hooper* as applying the "fairly and knowingly made" test to all releases.

But the trial court's analysis, while consistent with *Hooper*, cannot be reconciled with Supreme Court precedent. The *Finch* court adopted the "fairly and knowingly made" test as an exception to the general rule that releases are subject to the same rules as other contracts. *See Finch*, 84 Wn.2d at 142-43; *Bennett*, 108 Wn.2d at 396. And although the scope of unknown injuries covered by the *Finch* exception has been the source of judicial and academic debate, the fact that it *is an exception* has never been

questioned. *See, e.g., Bennett,* 108 Wn.2d at 401 (Dolliver, J., dissenting) (arguing *Finch* created an exception for cases involving latent injuries or unappreciated consequences of known injuries). Although there may be persuasive policy reasons for applying the relaxed *Finch* standard to all personal injury releases, that is not the rule of law that has been adopted by the Washington Supreme Court.

We therefore hold that the *Finch* "fairly and knowingly made" test applies only where a plaintiff claims unknown injuries. Because this case does not involve unknown injuries, the trial court erred in applying the *Finch* test to the facts of this case.

### 2. Judgment as a Matter of Law

Gene and Priscilla further argue that they are entitled to judgment as a matter of law under traditional contract principles. But, given the evidence presented at trial, a rational jury could find that Leonida reasonably relied on an erroneous translation or explanation of the release. Accordingly, Gene and Priscilla are not entitled to judgment as a matter of law.

██ ██ When determining whether a party is entitled to judgment as a matter of law, we apply the same standard as a trial court. *Delgado Guijosa v. Wal-Mart Stores, Inc.,* 144 Wn.2d 907, 915, 32 P.3d 250 (2001). We will therefore grant a defendant judgment as a matter of law only when no reasonable inference from the evidence supports a verdict for the plaintiff. *Delgado Guijosa,* 144 Wn.2d at 915. Evidence is sufficient to support a verdict if it could persuade a fair-minded, rational person of the validity of the plaintiff's claim. *Delgado Guijosa,* 144 Wn.2d at 915.

██ Generally, parties have a duty to read the contracts they sign. And a party who has limited knowledge—but treats that limited knowledge as sufficient—bears the risk of any mistake. *Tiegs v. Boise Cascade Corp.,* 83 Wn. App. 411, 426, 922 P.2d 115 (1996); *Bennett,* 108 Wn.2d at 395. Accordingly, although no Washington case has dealt di-

rectly with this issue, the general rule[2] adopted by other jurisdictions is that a person who signs a contract written in an unfamiliar language must attempt to have the contract explained or bears the risk of mistake:

> A good, and recurring, illustration of the duty-to-read issue involves a person who is illiterate or unfamiliar with the language in which the contract is written, or is blind or did not put reading glasses on, but signed the document without having anyone read it aloud or explain it. There is all but unanimous agreement that the party is bound. Therefore, except possibly in the case of an emergency, the party must employ self-protection by procuring someone to read aloud the document or to explain or translate it. However, if the other party is deceitful about its contents . . . [m]ost of the cases have held that such a contract may at least be avoided.

7 Joseph M. Perillo, Corbin on Contracts § 29.9, at 409-10 (rev. ed. 2002). *See also Sofio v. Hughes*, 162 A.D.2d 518, 556 N.Y.S.2d 717, 719 (1990) (holding plaintiff could not avoid release absent evidence he made "reasonable effort" to have document read to him); *Mesa v. Poole*, 127 Ga. App. 426, 193 S.E.2d 925, 927 (1972) (holding plaintiffs with limited proficiency in English could not avoid personal injury release, noting plaintiffs could have had English-speaking daughter translate it).

A more complicated issue arises, however, when a person who is unfamiliar with a contract's foreign language signs the contract after having another explain its contents, only to later find that the translator has misread or inadequately explained the document. Although there are very

---

[2] A few cases have imposed an affirmative duty to explain contracts when the defendants know the signer is illiterate or speaks another language. *See Scott v. Bodnar*, 52 N.J. Super. 439, 145 A.2d 643 (1958) (holding failure to explain consequence of signature to illiterate plaintiff could be grounds for avoiding release); *S. Pac. Co. v. Gastelum*, 36 Ariz. 106, 283 P. 719 (1929) (holding question of fact existed regarding fraud where release signed by plaintiff not understanding English language and defendant failed to cause release to be explained in plaintiff's language). Some jurisdictions have also distinguished between ignorance as to the terms of an instrument and ignorance regarding the nature of the instrument, holding that the latter may be cause for avoidance, but only where there is no negligence on the part of the signer. *See* 17A Am. Jur. 2d *Contracts* §§ 226-27 (1991).

few cases in other jurisdictions addressing this situation, the most commonly cited rule is that " '[i]f the signer [of a release] is illiterate, or blind, or ignorant of the alien language of the writing, and the contents thereof are misread or misrepresented to him by the other party, *or even by a stranger*, unless the signer be negligent, the writing is void.' " *Sofio*, 556 N.Y.S.2d at 719 (emphasis added) (quoting *Pimpinello v. Swift & Co.*, 253 N.Y. 159, 170 N.E. 530, 531 (1930)). In *Pimpinello*, the court held that a plaintiff who was unable to read a document due to illiteracy and relied on his attorney's interpretation of it could avoid the contract. *Pimpinello*, 170 N.E. at 531-32. The *Pimpinello* court cited *Thoroughgood's Case*, 2 Coke, 9a (1584), an English case in which the court excused an illiterate man from the effect of a contract because he asked a stranger to explain it and the stranger erroneously characterized the contract's terms:

> Not being competent to read the document, the plaintiff was told by his attorney that it was a mere receipt. In relying upon the word of one who had been his trusted lawyer, surely the plaintiff was less careless than was Thoroughgood in relying on the word of a stranger.

*Pimpinello*, 170 N.E. at 531-32. *See also* 7 Perillo, *supra*, § 28.38, at 222.

Although no Washington case addresses this issue directly, the *Pimpinello* rule finds some indirect support in our jurisprudence. In *Bjorklund v. Seattle Electric Co.*, 35 Wash. 439, 77 P. 727 (1904), the court held that the jury should decide whether a plaintiff's release was fraudulently obtained. The court noted that the plaintiff had limited knowledge of the English language. The court also reasoned that the plaintiff had a long relationship as employee with the defendant and therefore was justified in trusting its agents' statements regarding the nature of the form he signed:

> The jury could reasonably find, under the evidence, that appellant and respondent did not stand upon an equal footing,

by reason of the latter's imperfect understanding of English and the legal effect of what he signed, or the nature and extent of his injuries, while the agents of the former were fully informed. They could also reasonably find that respondent was justified in placing confidence in what appellant's agents told him, because of his long established relations with the company.

*Bjorklund*, 35 Wash. at 444. Although fraud is not alleged in this case, *Bjorklund* is persuasive for the proposition that a person who does not understand English may in some circumstances be justified in signing the document based on another's explanation of its contents. *See also Rodriguez v. Dep't of Labor & Indus.*, 85 Wn.2d 949, 953, 540 P.2d 1359 (1975) (tolling 60-day appeal period for Spanish-speaking worker's claim while his interpreter was unavailable, since "he was incapable of understanding the nature of the order closing his claim"); *Gaines v. Jordan*, 64 Wn.2d 661, 663-64, 393 P.2d 629 (1964) (holding sight-impaired lessor of gas station could avoid contract where lessee read contract aloud omitting two provisions).

■ ■ Viewing these Washington cases in conjunction with the secondary sources and cases from other jurisdictions, the rule that emerges is that a person unable to read a contract due to illiteracy or unfamiliarity with its language may later avoid it if he or she reasonably relied on another's erroneous translation or explanation of it. This rule applies regardless of whether the person who explained or translated the instrument was the opposing party and regardless of whether the translator's misrepresentation was fraudulent or merely mistaken.[3] *See Pimpinello*, 170 N.E. at 531-32. Rather, the focus in such

---

[3] Normally, a person would not be excused from a contract for a misrepresentation made by someone other than a party. But in the case of a non-English speaking party who relies on an erroneous translation or explanation of the contract by a third person, the contract may be avoided as long as the signer is free from negligence. The overriding question in such cases is not the degree to which the opposing party contributed to the misunderstanding, but the reasonableness of the steps the signer took to have the contract explained. Further, reasonable reliance is generally a question for the trier of fact unless the evidence is susceptible of only one conclusion. *See Bolser v. Clark*, 110 Wn. App. 895, 903, 43

cases has been whether the plaintiff's reliance on the translation or explanation was justified. *Compare Pimpinello*, 170 N.E. at 532 *with Sofio*, 556 N.Y.S. 2d at 719 *and Mesa*, 193 S.E.2d at 927. Although one who negligently signs without reading must generally bear the risk of mistake, taking reasonable steps to obtain a translation or explanation absolves the signer of negligence, and therefore allows avoidance where the translation or explanation turns out to be incorrect. This rule's effect is counterbalanced by the requirement that the party seeking to avoid a contract must demonstrate its invalidity by clear, cogent and convincing evidence. *See, e.g., Queen City Farms, Inc. v. Cent. Nat'l Ins. Co.*, 126 Wn.2d 50, 97, 882 P.2d 703, 891 P.2d 718 (1994).

 Further, we note that this rule, while generally applicable to all contracts, is consistent with Washington cases involving personal injury releases. When determining whether to invalidate a release, courts weigh the policy in favor of upholding settlement agreements against the policy favoring just compensation of accident victims. *Bennett*, 108 Wn.2d at 394-95; *Finch*, 84 Wn.2d at 145. Where an accident victim is unable to understand English and makes no effort to have the contract explained, the scales tip in favor of upholding the release because the accident victim has assumed the risk that the contract contains unknown, unfavorable terms. *Bennett*, 108 Wn.2d at 396. But where such a plaintiff claims that he or she reasonably relied on an erroneous translation or explanation of the agreement, such risk allocation against the plaintiff is not warranted. Unlike the situation in *Bennett*, where the plaintiffs knew they were injured but assumed the risk of further complications in exchange for quick money, an erroneous translation is not a risk that parties factor into the bargaining process. *Cf. Bennett*, 108 Wn.2d at 395.

P.3d 62 (2002) (citing *Barnes v. Cornerstone Invs., Inc.*, 54 Wn. App. 474, 478, 773 P.2d 884 (1989)).

Applying this rule to the facts of this case, we hold that Leonida raised a genuine issue of fact regarding the validity of the release she signed. Gene and Priscilla argue that Leonida assumed the risk of mistake because she did not ask Priscilla to read and translate the entire contract before she signed it. But according to the testimony of both Leonida and Priscilla, the insurance agent went over the contract and explained it to Priscilla, who then translated for Leonida. Leonida testified that Priscilla told her that the release was for lost wages only. Although Priscilla testified that she told Leonida the release covered pain and suffering as well as lost wages, we do not weigh credibility. Further, Priscilla is a family member whom Leonida trusted to explain the contract, so we cannot say that Leonida was negligent as a matter of law for relying on Priscilla's explanation. *Cf. Mesa*, 193 S.E.2d at 927 (holding signers negligent for failing to have English-speaking daughter explain writing). *See also Bjorklund*, 35 Wash. at 444 (holding jury could find worker's long relationship with employer justified his reliance on employer's explanation of release). In these circumstances, it is for the trier of fact to decide whether Priscilla adequately explained the release and whether Leonida acted reasonably when she relied on Priscilla's explanation.

3. Jury Instructions

▪ Although the jury was entitled to decide these issues, it must do so with proper instructions as to the law and the burden of proof. The trial court's jury instructions reflected its erroneous conclusion that the "fairly and know-ingly made" test should apply, and failed to adequately inform the jury of Leonida's burden of showing that the release was invalid by clear and convincing evidence. "[A]n instruction that contains an erroneous statement of the applicable law is reversible error where it prejudices a party." *Cox v. Spangler*, 141 Wn.2d 431, 442, 5 P.3d 1265, 22 P.3d 791 (2000) (citing *State v. Wanrow*, 88 Wn.2d 221, 236, 559 P.2d 548 (1977)). Given the conflicting evidence, we cannot say that the court's failure to instruct the jury on the proper legal standard and burden of proof was harmless.

*See Wanrow*, 88 Wn.2d at 237 (error in instruction presumed prejudicial unless shown to be harmless). Because the court's instructions misstated the law and could have affected the outcome of the trial, we reverse and remand for a new trial with appropriate instructions.

On remand, the trial court should instruct the jury that a release is valid unless shown to be invalid by clear, cogent, and convincing evidence. The court should also instruct the jury that a person who signs a contract written in a language he or she does not understand has a duty to take reasonable steps to have the contract translated or explained. The court should further instruct the jury that a person who is unable to read a contract and relies on another's erroneous translation or explanation of it may avoid the contract unless the signer has been negligent.

4. Bifurcation

Finally, we hold that the trial court acted within its discretion when it denied Gene and Priscilla's request to hold separate trials regarding damages and the validity of the release. CR 42(b) gives the court authority to order separate trials of any issues "in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy . . . ." We review the trial court's decision on this matter for abuse of discretion, and we will not reverse the court's decision if it rests on tenable bases. *Hawley v. Mellem*, 66 Wn.2d 765, 768, 405 P.2d 243 (1965). *See also Boeing Co. v. Heidy*, 147 Wn.2d 78, 90, 51 P.3d 793 (2002). The trial court based its decision to hold a single trial on the lack of any prejudice and the court's belief that even if Gene and Priscilla prevailed on the release issue, very little time would be saved by bifurcating the trial. Those are tenable bases. Gene and Priscilla failed to demonstrate how they were prejudiced by a single trial or explain how severing the trial would promote judicial economy. *See Brown v. Gen. Motors Corp.*, 67 Wn.2d 278, 282, 407 P.2d 461 (1965) (noting "piecemeal litigation" is generally discouraged, especially in personal injury cases where "the issues of liability and damages are

generally interwoven"). Although allowing evidence of insurance can be prejudicial in some cases, here liability was not at issue, and any prejudice was outweighed by concerns for judicial economy. Further, the trial court properly instructed the jury not to consider whether the parties had insurance in reaching its decision, and the jury is presumed to have followed that instruction unless that presumption is overcome by a showing otherwise. *City of Bellevue v. Kravik*, 69 Wn. App. 735, 743, 850 P.2d 559 (1993). Accordingly, we hold that the trial court did not abuse its discretion when it allowed a single jury to decide this case.

## CONCLUSION

We hold that the "fairly and knowingly made" standard applies only to personal injury releases when the injured party claims unknown injuries, so the trial court should not have used that standard in this case. But, under general contract principles, questions of material fact remain regarding whether the release may be avoided. We therefore reverse and remand for proceedings consistent with this opinion.

BECKER, C.J., and SCHINDLER, J., concur.

Reconsideration denied June 23, 2003.