## COURT OF APPEALS, DIVISION III, STATE OF WASHINGTON

| | | |
|---|---|---|
| DAVID W. MURPHY, as Personal Representative for the Estate of KATHLEEN J. MURPHY, | ) ) ) ) | No.    37545-5-III |
| Appellant, | ) ) ) | ORDER CORRECTING OPINION AND OTHERWISE DENYING MOTION FOR RECONSIDERATION |
| v. | ) ) | |
| MEDICAL ONCOLOGY ASSOCIATES, P.S., a Washington corporation; ARVIND CHAUDHRY, M.D., Ph.D.; RAJEEV RAJENDRA, M.D.; BRUCE CUTTER, M.D.; PROVIDENCE HEALTH & SERVICES, a Washington corporation, d/b/a PROVIDENCE HOLY FAMILY HOSPITAL; HEATHER HOPPE, Pharm.D.; and ERIN WHITE, Pharm.D., | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Respondents. | ) ) | |

THE COURT has considered Appellant's motion for reconsideration and the record and file therein, and is of the opinion that corrections to the opinion filed June 29, 2023, should be made to statements on page 9, and that the motion should otherwise be denied.

The opinion shall be corrected as follows:

The first full paragraph on page 9 is corrected to read:

No.   37545-5-III

During jury selection, and after prospective jurors had heard something about the case, the court asked them whether there was anything about the case that "would cause you to begin this trial with any feelings or concerns regarding your participation as a juror." RP at 81. Two individuals raised their hands, and the court questioned both. One of the prospective jurors, number 15, explained that he raised his hand because "Dr. Chaudhry treated my brother years ago during his cancer as an oncologist." RP at 81. Asked if he had ever met the doctor, number 15 responded that he had, over 10 years earlier, "At a very young age, around just 8, 9 years old." *Id.* A second juror, prospective juror 25, disclosed that Dr. Chaudhry was her mother's oncologist.

Therefore,

IT IS ORDERED, the opinion will be corrected on page 9 as indicated and the

motion for reconsideration of this court's decision of June 29, 2021, is otherwise denied.

PANEL:  Judges Siddoway, Fearing, Pennell

FOR THE COURT:

_____
GEORGE B. FEARING
Chief Judge

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| DAVID W. MURPHY, as Personal Representative for the Estate of KATHLEEN J. MURPHY, | ) ) ) ) | No. 37545-5-III |
| Appellant, | ) ) | |
| v. | ) ) | UNPUBLISHED OPINION |
| MEDICAL ONCOLOGY ASSOCIATES, P.S., a Washington corporation; ARVIND CHAUDHRY, M.D., Ph.D.; RAJEEV RAJENDRA, M.D.; BRUCE CUTTER, M.D.; PROVIDENCE HEALTH & SERVICES, a Washington corporation, d/b/a PROVIDENCE HOLY FAMILY HOSPITAL; HEATHER HOPPE, Pharm.D.; and ERIN WHITE, Pharm.D., | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Respondents. | ) | |

SIDDOWAY, J. — In this medical malpractice action that resulted in a defense

verdict below, David Murphy, as the personal representative of the estate of his mother,

sued some of the doctors who treated her in her final illness. He contends it was error for

the trial court not to strike, sua sponte, at least two prospective jurors for cause and not to

exclude, sua sponte, defense evidence that he contends violated the dead man's statute or

evidence rules. He also appeals the denial of his motion for a new trial on an informed

consent claim.

He fails to demonstrate actual bias on the part of any juror, and assuming without agreeing that defense witnesses provided inadmissible testimony, error was not preserved. We affirm.

FACTS AND PROCEDURAL BACKGROUND

*Medical treatment*

In late May 2015, Kathleen Murphy was admitted to Holy Family Hospital in Spokane for a worsening of unwellness she had experienced since being hospitalized in the beginning of 2015 for exacerbation of chronic obstructive pulmonary disease (COPD). COPD is a "lung disease of the airways where there is a certain obstructive pattern on how people are able to exhale or inhale." Rep. of Proc. (RP) at 395. It is often caused by long term smoking. Kathleen's[1] treatment providers were aware she was a half-a-pack per day smoker.

Soon after her admission, a tissue biopsy revealed that Kathleen had Hodgkin's lymphoma. Hodgkin's lymphoma is a cancer that primarily affects the lymph nodes and other lymphoid tissue in the body.

On June 2, Kathleen established care with Dr. Arvind Chaudhry, an oncologist with Medical Oncology Associates, P.S. Dr. Chaudhry would later testify that Kathleen had an unusual presentation of Hodgkin's disease. For one thing, the disease is rare in

---

[1] Given the common last name, and for clarity, we refer to David as "Mr. Murphy" but to other members of the family by their first names. We intend no disrespect.

someone who is 65 years old. In addition, Kathleen had nodules in her lungs and liver in addition to enlarged lymph nodes; if it *was* Hodgkin's disease, that meant it had progressed to other organs. Believing it might be a different type of lymphoma, Dr. Chaudhry deferred a treatment decision pending a report on the pathology. The pathology confirmed that Kathleen had Hodgkin's lymphoma.

On June 4, Kathleen met with Dr. Rajeev Rajendra, one of Dr. Chaudhry's colleagues, because Dr. Chaudhry was unavailable. Present during this meeting were Kathleen's son, Michael, and her daughter, Susan. According to medical records, the meeting lasted 35 to 40 minutes and included discussion of treatment objectives.

Dr. Rajendra ordered a pulmonary function test to measure lung health, information needed to determine whether Kathleen could take a drug called bleomycin. Bleomycin is one drug within a chemotherapy regimen called "ABVD." ABVD is named for its four drug components: adriamycin, bleomycin, velban, and dacarbazine. In Dr. Chaudhry's opinion, ABVD was the best available avenue for the treatment and cure of Hodgkin's disease and gave Kathleen the best shot at curing her cancer. The standard treatment with the ABVD regimen is a cycle every four weeks, with drug infusions on day 1 and day 15 of each cycle. Chemotherapy is most efficacious if the patient is able to stay on schedule with the recommended dosage.

Dr. Chaudhry reviewed Dr. Rajendra's notes before seeing Kathleen the following day, June 5. The medical record of Dr. Chaudhry's visit with Kathleen that morning states, in part, "Dr[.] Raj has discussed chemo options." Ex. D102, at 226. It continues, "She would like to proceed, but focused on eating today. . . . Hope to start this weekend. Will need ABVD." *Id.* at 226-27. Dr. Chaudhry recognized that Kathleen "did not have too much time to wait for all the testing and results." RP at 404. Nevertheless, he wished to have received all of the informative pathology before beginning chemotherapy.

On the morning of June 6, Dr. Chaudhry met again with Kathleen. He recommended ABVD "in-house," meaning in the hospital. RP at 273. His note of the visit adds: "Discussed risks and benefits." Ex. D102 at 220. Kathleen also received printed information about chemotherapy guidelines and drugs. The first administration of ABVD occurred that day.

Kathleen's white blood cell count dropped following the first administration, a condition called "neutropenia." RP at 274. As a result, the second administration of ABVD was postponed, and Dr. Chaudhry decided to reduce the dosage of adriamycin. Kathleen was discharged from the hospital to a nursing facility on June 22.

Kathleen received her delayed second administration of ABVD at the doctors' clinic, on July 2. Medical records of her meeting with a nurse practitioner on that date state, "Discussed risks and side effects of therapy in detail with patient. Written materials

4

provided. She wishes to proceed." Ex. D101, at 16. Consent paperwork signed by Kathleen at that time listed the chemotherapy drugs and their side effects.

Kathleen had an infection following this second chemotherapy and was readmitted to Holy Family Hospital on July 12. A CT[2] scan showed a mild pulmonary edema at her lung bases. She was discharged on July 15. She agreed to go forward with her third administration of ABVD and received it on July 16.

Sometime after, Kathleen was sent to Valley Hospital after showing low white blood cell counts once more. On July 30, Dr. Chaudhry decided to delay the next administration of ABVD and to reduce the dosage of adriamycin to prevent further episodes of neutropenia. At that point, Dr. Chaudhry had determined to cease providing care to Kathleen as soon as she could be seen by another physician.[3]

On August 13, Dr. Bruce Cutter, another oncologist with Medical Oncology Associates, assumed Kathleen's care and she received her fourth administration of ABVD. An entry in the medical record states that Dr. Cutter, Kathleen, and Susan "had a good talk and all wish to continue care here." Ex. D101, at 10. Dr. Cutter's notes

---

[2] Computed tomography.

[3] Apparently Susan had her own thoughts about how her mother's neutropenia should have been treated, which led to friction with Dr. Chaudhry and his notification that Kathleen should seek treatment from another oncologist. Before trial, the defendants sought an order in limine excluding evidence on this collateral issue. The trial judge agreed that the jury should hear only that the care was transferred, unless Mr. Murphy could demonstrate that the particulars were important.

"emphasized plan is to cure her" and recorded that "[w]e need to be aggressive to do so." *Id.* At a follow-up later that week, Kathleen reported feeling unwell and displayed some shortness of breath with exertion. Dr. Cutter conducted a physical exam and noted no baseline respiratory issues. He attributed her symptoms to her ongoing anemia. Before her next visit, Kathleen received a transfusion of two units of red blood cells.

At her next visit, on August 27, Kathleen presented with diffuse "crackles" in her lower lung bases. Lung crackles, or crepitations, are detectable by stethoscope and often sound like "Velcro opening up." RP at 450.[4] They can be an early indication of bleomycin toxicity, but may be caused by many ailments, including Hodgkin's lymphoma in the lungs. This was the first time Dr. Cutter heard lung crackles in Kathleen. Although Dr. Cutter had growing concerns about the dose delays and modifications affecting Kathleen's chemotherapy, he decided to hold off treatment until the next week, as a start, to do diagnostic testing. A few days later, Kathleen visited the emergency room where complaints of lightheadedness and dizziness were treated.

On September 10, the lung crackles were still present. Given a concern about bleomycin toxicity but the continued goal to aggressively pursue a cure, Kathleen received a fifth administration of chemotherapy consisting of only ADV. The next day,

---

[4] The "popping sound" is made when the alveoli "try to open up." RP at 450-51.

Dr. Cutter treated Kathleen with Neulasta, which causes bone marrow to produce more white blood cells.

On September 13, Kathleen went to the hospital by ambulance with significant shortness of breath. She was admitted to the intensive care unit (ICU) and placed on a ventilator. The treating physicians diagnosed Kathleen with acute respiratory distress syndrome (ARDS).

Kathleen died on September 24. Her treating physician in the ICU described the cause of death as ARDS, recording it in her medical record as acute cardiopulmonary failure secondary to pneumonia with underlying COPD and Hodgkin's disease.

*Litigation*

David Murphy thereafter brought suit against a number of medical providers and practices, but by the time of trial he had dismissed claims against all but Medical Oncology Associates, Dr. Chaudhry and Dr. Cutter. He asserted claims for medical malpractice under chapter 7.70 RCW and negligence, personal injury claims that survived Kathleen's death under RCW 4.20.060. On behalf of Kathleen's children, he asserted a claim of wrongful death under RCW 4.20.010 and .020.

In pretrial motions in limine, Mr. Murphy asked the court to preclude Drs. Chaudhry and Cutter from testifying to transactions with and statements made by Kathleen, which he argued were inadmissible under Washington's dead man's statute,

7

No. 37545-5-III
*Murphy v. Medical Oncology Assoc., PS*

RCW 5.60.030.[5] He acknowledged that testimony by third parties is not excluded by the statute; only parties in interest are precluded from testifying on their own behalf.

The defendants responded that the dead man's statute applies only to actions brought on behalf of the decedent's estate, and because Mr. Murphy also asserted a wrongful death claim for the benefit of Kathleen's children, the statute, by its terms, did not apply.

After hearing argument, the court observed that the parties appeared to agree that the dead man's statute applied to Kathleen's claims that survived her death, but not to the wrongful death claim on behalf of the children. As to the latter claim, then, the evidence was not precluded by the statute. The court observed that testimony about communications between providers and Kathleen might still be inadmissible hearsay. Ultimately, the court offered a tentative, qualified ruling:

> [N]ot knowing what the testimony, what it's going to look like, I'm sort of guessing and putting some parameters on this. If there's—the deadman's

---

[5] RCW 5.60.030 does not generally prevent an interested party from giving evidence by reason of his or her interest in the event of the action, but is subject to the key proviso,

> That in an action or proceeding where the adverse party sues or defends as executor, administrator or legal representative of any deceased person, or as deriving right or title by, through or from any deceased person . . . then a party in interest . . . shall not be admitted to testify in his or her own behalf as to any transaction had by him or her with, or any statement made to him or her, or in his or her presence, by any such deceased, incompetent or disabled person.

8

statute doesn't apply.  So if it's not hearsay, then it comes in.  If you're not suggesting that it's hearsay, then it comes in.

RP at 361.  Mr. Murphy's lawyer had conceded that case law recognizes medical records as an exception to the bar established by the dead man's statute, and the trial court ruled that medical records were "fair game."  RP at 360.

During jury selection, and after prospective jurors had heard something about the case, the court asked them whether there was anything about the case that "would cause you to begin this trial with any feelings or concerns regarding your participation as a juror."  RP at 81.  Sixteen individuals raised their hands, and the court questioned each. One of the prospective jurors, number 15, explained that he raised his hand because "Dr. Chaudhry treated my brother years ago during his cancer as an oncologist."  RP at 81. Asked if he had ever met the doctor, number 15 responded that he had, over 10 years earlier, "At a very young age, around just 8, 9 years old."  *Id.*  A second juror, prospective juror 25, disclosed that Dr. Chaudhry had been her mother's oncologist.

When questioning was turned over to the lawyers, Mr. Murphy's lawyer questioned number 15 briefly about his brother's treatment by Dr. Chaudhry.  He did not engage in any individual questioning of number 25.  When the court entertained challenges for cause at the conclusion of voir dire, Mr. Murphy had no for-cause challenges.

9

During the trial, jurors heard testimony from defendants Dr. Chaudhry and Dr. Cutter, and from four other treating providers: two hospitalists who had worked at Holy Family Hospital, Dr. Peter Weitzman and Dr. Jeremy Cope, and two physicians who had cared for Kathleen in the Holy Family ICU: Dr. Jeffrey Elmer and, by deposition, Dr. Donald Howard.  They heard testimony from Mr. Murphy and briefly from Susan.  They heard from two expert witnesses for Mr. Murphy: Dr. John Sweetenham, an oncologist, and Dr. Michael Fishbein, a pathologist specializing in pathology of the heart and lung.  They also heard from two experts for the defense: Dr. Curtis Veal, an internist specializing in pulmonary disease and critical care and Dr. Craig Nichols, an oncologist.

In closing argument, Mr. Murphy's lawyers emphasized the testimony of their expert, Dr. Sweetenham, that while the ABVD regime is the gold standard for treating Hodgkin's lymphoma in younger people, the bleomycin component presents a risk of bleomycin toxicity, and death, in older individuals.  Dr. Sweetenham opined that the four to five percent increase in a cure that is presented by including bleomycin is more than offset by the risk of the patient developing bleomycin toxicity.  Mr. Murphy's lawyers argued that Kathleen should have been informed of what they contended was a safer course of treatment for her: a regimen that excluded bleomycin.

Mr. Murphy's lawyers spent a considerable part of their argument talking about the informed consent claim, arguing that the lack of detail in the medical records about

the risks and alternatives discussed was evidence that bleomycin toxicity and the alternative of omitting bleomycin had not been discussed. They also argued that the written documentation of informed consent obtained on July 2 proved that obtaining it was overlooked earlier. They reminded jurors of the testimony of their expert pathologist, Dr. Fishbein, that the diffuse alveolar damage to Kathleen's lungs that resulted in her death from ARDS was more probably than not the result of bleomycin toxicity.

Defense lawyers emphasized that all the experts agreed that the ABVD regime for treating Hodgkin's lymphoma had been the gold standard for 40 years. They argued that Drs. Chaudhry and Cutter would have breached the standard of care had they *not* recommended it. They pointed to entries in the contemporaneous medical records that Kathleen's treatment objective was cure, not palliative treatment, as reported not only by her but by her children. They pointed to four medical record entries that they argued reflected advice and consent about treatment and options before the first administration of ABVD. Addressing the July 2 documentation of informed consent, they contended it was obtained as a matter of routine because it was the first administration Kathleen had received at their clinic, since the first administration took place at Holy Family Hospital. They reminded jurors that Dr. Nichols had extensive experience treating patients with bleomycin and expressed the opinion that ABVD was the best treatment option for

Kathleen notwithstanding her age. They pointed out that while it was undesirable that Kathleen's neutropenia had caused delays in her doses, contemporaneous entries in the medical records supported a conclusion that the ABVD treatment had been working, and conflicted with plaintiff's theory that bleomycin toxicity caused the ARDS that was her cause of death. They reminded jurors that the experts agreed that ARDS could be the result of oxygen toxicity or pneumonia.

The jury returned a defense verdict on all claims. Mr. Murphy moved for a new trial on the issue of informed consent, which the court denied. Mr. Murphy appeals denial of his motion for a new trial and the judgment.

I. THE TRIAL COURT DID NOT ERR BY FAILING TO EXCLUDE JURORS SUA SPONTE

Mr. Murphy's first assignment of error is to the trial court's alleged error in failing, sua sponte, to strike certain prospective jurors for cause. For the first time on appeal, Mr. Murphy contends that prospective juror 15, who was seated as juror 8 (and who we generally refer to hereafter as juror 8), was actually biased.[6] He also contends

---

[6] A threshold issue of whether Mr. Murphy allowed prospective juror 15 to be seated without exhausting his peremptory challenges, thereby precluding his ability to appeal on the basis that juror15 should have been excused, is not addressed by the parties. Appeal is unavailable in such a case, as recently clarified by our Supreme Court in *State v. Talbott*, 200 Wn.2d 731, 521 P.3d 948 (2022). *Talbott* also rejects Mr. Murphy's suggestion that if he was required to exercise a peremptory challenge to exclude prospective juror 25, that would be prejudicially unfair. Opening Br. of Appellant at 35 n.2; s*ee Talbott*, 200 Wn.2d at 739 (a party's rights are not violated "'simply because [they] had to use peremptory challenges to achieve an impartial jury'") (alteration in original) (quoting *State v. Fire*, 145 Wn.2d 152, 163, 34 P.3d 1218 (2001)).

12

for the first time on appeal that by failing to strike members of the venire whose close family members were or had been patients of the defending doctors, the court "gave the defendant doctors an unfair advantage in jury selection . . . result[ing] in a biased jury." Opening Br. of Appellant at 5.

Because neither objection was raised in the trial court, Mr. Murphy recognizes that RAP 2.5(a) requires him to demonstrate that "'(1) the error is manifest and (2) the error is truly of constitutional dimension.'" *State v. J.W.M.*, 1 Wn.3d 58, 90, 524 P.3d 596 (2023) (quoting *State v. O'Hara*, 167 Wn.2d 91, 98, 217 P.3d 756 (2009)). Proof that an alleged error is manifest requires a showing of actual prejudice; stated differently, it requires that the asserted error had practical and identifiable consequences at trial. *Id.* (citing *State v. Kirkman*, 159 Wn.2d 918, 935, 155 P.3d 125 (2007)). A manifest constitutional error remains subject to a harmless error analysis. *Id.*

Article I, section 21 of the Washington State Constitution provides that "the right of trial by jury shall remain inviolate." In civil proceedings, "'[t]he right to trial by jury includes the right to an unbiased and unprejudiced jury, and a trial by a jury, one or more whose members is biased or prejudiced, is not a constitutional trial.'" *Henderson v. Thompson*, 200 Wn.2d 417, 434, 518 P.3d 1011 (2022) (internal quotation marks omitted) (quoting *Mathisen v. Norton*, 187 Wash. 240, 245, 60 P.2d 1 (1936)); *see also Allison v. Dep't of Lab. & Indus.*, 66 Wn.2d 263, 265, 401 P.2d 982 (1965).

13

No. 37545-5-III
*Murphy v. Medical Oncology Assoc., PS*

The court has a duty to act on a prospective juror's apparent bias or prejudice. "Both RCW 2.36.110[7] and CrR 6.4(c)(1)[8] create a mandatory duty to dismiss an unfit juror even in the absence of a challenge." *State v. Lawler*, 194 Wn. App. 275, 284, 374 P.3d 278 (2016). Contrary to the doctors' position, a party able to demonstrate the actual bias of a juror may seek relief on appeal even after having been afforded an opportunity for a full and fair voir dire, and after failing to challenge the juror for cause.

A juror demonstrates actual bias when he or she exhibits "a state of mind . . . in reference to the action, or to either party, which satisfies the court that the challenged person cannot try the issue impartially and without prejudice to the substantial rights of the party challenging." RCW 4.44.170(2). "Equivocal answers alone do not require that a juror be dismissed for cause." *Lawler*, 194 Wn. App. at 283. A juror who has preconceived ideas need not be excused if the juror credibly states that she or he can set those ideas aside and decide the case on the basis of the evidence presented and the law as instructed by the court. *State v. Rupe*, 108 Wn.2d 734, 748, 743 P.2d 210 (1987). To excuse a juror based on actual bias, the trial court "must be satisfied, from all the

---

[7] "It shall be the duty of a judge to excuse from further jury service any juror, who in the opinion of the judge, has manifested unfitness as a juror by reason of bias, prejudice, indifference, inattention or any physical or mental defect or by reason of conduct or practices incompatible with proper and efficient jury service."

[8] "If the judge after examination of any juror is of the opinion that grounds for challenge are present, he or she shall excuse that juror from the trial of the case. If the judge does not excuse the juror, any party may challenge the juror for cause."

14

circumstances, that the juror cannot disregard such opinion and try the issue impartially." RCW 4.44.190.

The party challenging a potential juror on the ground of actual bias has the burden of proving the facts necessary to the challenge by a preponderance of the evidence. *Ottis v. Stevenson-Carson Sch. Dist. No. 303*, 61 Wn. App. 747, 754, 812 P.2d 133 (1991). Because "'the trial court is in the best position to determine a juror's ability to be fair and impartial,'" we review a trial court's decision not to dismiss a juror for manifest abuse of discretion. *State v. Guevara Diaz*, 11 Wn. App. 2d 843, 856, 456 P.3d 869 (2020) (quoting *State v. Noltie*, 116 Wn.2d 831, 839, 809 P.2d 190 (1991)). A trial court's implicit decision not to dismiss a juror sua sponte is subject to the same review. The trial court's fact-finding discretion includes the power to weigh the credibility of the prospective juror. *Ottis*, 61 Wn. App. at 753-54.

Actual bias has been found in the case of a juror who made an unqualified representation in a questionnaire that she could not be fair to both sides. *Guevara Diaz*, 11 Wn. App. 2d at 846. It has been found in a case in which a juror responded, when asked if she might not be able to give both sides a fair trial, that she was "more inclined towards the prosecution I guess," and said, "I would like to say [the defendant's] guilty." *State v. Irby*, 187 Wn. App. 183, 190, 347 P.3d 1103 (2015). It has been found in a case in which a juror "unequivocally admitted a bias . . . in favor of police witnesses,"

"indicated the bias would likely affect her deliberations," and "candidly admitted she did not know if she could presume [the defendant] innocent in the face of officer testimony indicating guilt." *State v. Gonzales*, 111 Wn. App. 276, 281, 45 P.3d 205 (2002), *overruled on other grounds by State v. Talbot*, 200 Wn.2d 731, 521 P.3d 948 (2022).

In this case, members of the venire were asked early in voir dire to identify themselves and answer a handful of questions, one of which was, "Can you be fair?" RP at 86-87. Juror 8 answered that question, "I believe I can be fair." RP at 91. When the parties were given their opportunity to question the venire, Mr. Murphy's lawyer asked whether anyone had any feelings about medical malpractice, and juror 8 was one of the individuals who raised his hand. He and the lawyer engaged in the following exchange:

> [PROSPECTIVE] JUROR NO. 15: I mentioned earlier my slight experience with Dr. Chaudhry and you mentioning malpractice, I believe it was?
>
> [PLAINTIFF'S COUNSEL]: Yes, negligence.
>
> [PROSPECTIVE] JUROR NO. 15: I—I've had both good doctors and bad doctors in my experience. So I don't feel like I would have a bias I would express anyways or even have it internally. But I have been caught in the medical system, my family and myself, for generations literally. But I've seen both sides of it.
>
> [PLAINTIFF'S COUNSEL]: And thank you again for sharing that. Maybe you could share a little more about your feelings here as far as being able to sit on this jury?

16

[PROSPECTIVE] JUROR NO. 15: I don't think I would have a problem, to answer you very generically. Personally, I don't know Dr. Chaudhry at all.

[PLAINTIFF'S COUNSEL]: Okay.

[PROSPECTIVE] JUROR NO. 15: But I know my brother's experience and what little bit I shared of that. And I know my mother was very close with Dr. Chaudhry during my brother's experience. However, like I say, that was years ago for me. But I would—I would have to take this case by case, just as I do everything else.

[PLAINTIFF'S COUNSEL]: Okay, that's good. Thank you.

And I guess the thing—do I have or my client have anything to fear here that because of your experience with your brother, you might lean one way or the other?

[PROSPECTIVE] JUROR NO. 15: I don't believe so, because I don't trust anybody's opinion, even my own sometimes, meaning that because my brother had a good experience with Dr. Chaudhry does not mean that I would or that his mother would have.

[PLAINTIFF'S COUNSEL]: Okay, thank you very much for sharing that.

RP at 103-04.[9]

Juror 8's answers cannot be characterized as even equivocal statements of bias or prejudice. Mr. Murphy points to juror 8's statement that he was 8 or 9 years old at the time of his brother's cancer and speculates that he would have been "impressionable," and that in this "searing context," juror 8 would have perceived Dr. Chaudhry as having

---

[9] Juror 8 later engaged in a more extensive exchange with defense counsel, after defense counsel asked the venire about any history of having a treatment relationship terminated by their doctor. *See* RP at 178-80. He talked about his relationships with three doctors; some favorable, some not. Mr. Murphy has nothing to say about these additional disclosures by juror 8, other than to dismiss them as "progressively less responsive." Opening Br. of Appellant at 24.

"*saved his brother's life.*" Opening Br. of Appellant at 23, 26; Reply Br. of Appellant at 13. Mr. Murphy points to juror 8's statement that his mother was "very close" to Dr. Chaudhry during his brother's care and speculates that no such son "could reasonably be considered free from actual bias." Opening Br. of Appellant at 26. But Mr. Murphy never obtained juror 8's agreement that he had been impressionable, or that he had such attitudes. Rather, juror 8 spoke of "what little bit [he] shared" of his brother's experience, and stated, "Personally, I don't know Dr. Chaudhry at all," and "like I say, that was years ago for me." RP at 104.

Ultimately, what Mr. Murphy is asking us to do is to *infer* bias from the "doctor-to-a-close-family member" relationship. But challenges for implied bias are governed by RCW 4.44.180, which identifies relationships for which a challenge for implied bias may be taken "and not otherwise." Being a close family member of a patient of a party is not identified as a basis for a challenge for implied bias. Accordingly, Mr. Murphy is required to demonstrate juror 8's actual bias, and he fails to do so.

Mr. Murphy's remaining argument is that once it was revealed that prospective juror 25's mother was a current patient of Dr. Chaudhry, the trial court should have excused all similarly-situated venire members sua sponte. This is despite the fact that in introducing herself and answering the question, "Can you be fair?" prospective juror 25 answered, "I can be fair." RP at 95. Mr. Murphy's lawyers did not use their allotted time

18

in voir dire to ask her any questions. Mr. Murphy argues that this categorical

disqualification was nevertheless required because the defense would otherwise have

unfair access to information about how the jurors' family members had fared under the

defendants' treatment.

Again, Mr. Murphy is required to demonstrate manifest constitutional error. He

offers no legal authority or analysis supporting the proposition that a party has a

constitutional right to disqualify a prospective juror if the party's adversary might have

greater access to information about that juror. "'[N]aked castings into the constitutional

sea are not sufficient to command judicial consideration and discussion.'" *In re Rosier*,

105 Wn.2d 606, 616, 717 P.2d 1353 (1986) (quoting *United States v. Phillips*, 433 F.2d

1364, 1366 (8th Cir. 1970)).

II.     THE TRIAL COURT DID NOT ERR BY FAILING TO INTERCEDE AND, SUA SPONTE,
        EXCLUDE UNOBJECTED-TO TESTIMONY

Mr. Murphy's next assignment of error is to testimony by Drs. Chaudhry, Cutter,

and Nichols supportive of Kathleen's informed consent that he contends was speculative,

unduly prejudicial, or violated the dead man's statute. The complained-of testimony was

not objected to, but he advances two theories on which he claims to avoid the issue

preservation problem. He also argues that because the dead man's statute would have

applied to the estate's assertion of Kathleen's claims that survived her death, the trial

court should have severed the wrongful death claim sua sponte.

19

A.      The cumulative error doctrine does not apply

Mr. Murphy first seeks to avoid the issue preservation problem by invoking the cumulative error doctrine. The cumulative error doctrine applies "'when there have been several trial errors that standing alone may not be sufficient to justify reversal but when combined may deny a defendant a fair trial.'" *In re Pers. Restraint of Morris*, 176 Wn.2d 157, 172, 288 P.3d 1140 (2012) (quoting *State v. Greiff*, 141 Wn.2d 910, 929, 10 P.3d 390 (2000)). Mr. Murphy acknowledges that this court has repeatedly held that cumulative error is not a method for obtaining appellate review of unpreserved issues. Opening Br. of Appellant at 37. Instead, cumulative error is "simply a recognition that the net impact of multiple small errors can still result in a prejudicial impact on the trial." *Rookstool v. Eaton*, 12 Wn. App. 2d 301, 311-12, 457 P.3d 1144 (2020). Nevertheless, Mr. Murphy points to our Supreme Court's statement in *State v. Clark*, 187 Wn.2d 641, 649, 389 P.3d 462 (2017), that "cumulative error present[s a] constitutional issue[ ] which we review de novo," and urges us to "follow the Supreme Court's reasoning" by reviewing his assigned error under "RAP 2.5(a)(3)'s manifest constitutional error doctrine." Opening Br. of Appellant at 38.

Cumulative error *does* present a constitutional issue, which *Rookstool* recognizes, analyzing it as implicating the fair trial right. *See* 12 Wn. App. 2d at 309-11. But a party must still present individually harmless *preserved* errors, or individually harmless

manifest constitutional errors, before asking this court to consider whether, cumulatively, they operated to deprive the party of a fair trial. *Clark* does not hold otherwise. The cumulative evidence doctrine does not apply.

     B.     Mr. Murphy identifies only a narrow basis for a standing objection

Mr. Murphy's second argument is that his motions in limine created a standing objection sufficient to preserve his challenges on appeal. When a party has moved in limine in the trial court to exclude evidence, "giving the trial court opportunity to rule on relevant authority, and the court does so rule, it may not be necessary to object at the time of admission of the claimed erroneous evidence in order to preserve the issue for appeal." *State v. Sullivan*, 69 Wn. App. 167, 170, 847 P.2d 953 (1993). The party losing the motion in limine has a standing objection to the evidentiary issue decided. *Id.* at 170-71. The rule protects the losing party from being required to renew its objection in front of the jury "at the risk of making comments prejudicial to its cause, as well as incurring the annoyance of the trial judge." *Id.* at 171. The rule only applies "[w]hen the trial court has clearly and unequivocally ruled against the exclusion of evidence." *Id.*

Here, the rule afforded Mr. Murphy a standing objection to the trial court's ruling on the dead man's statute-related issue that he lost: its ruling that "the deadman's statute doesn't apply." RP at 361. Mr. Murphy baldly asserts that the standing objection created by his loss on that issue "should be construed to preserve a challenge to Dr. Chaudhry['s]

21

and Dr. Cutter's speculative testimony," Opening Br. of Appellant at 47, but he provides no authority or reasoning in support. He had no standing objection to speculative testimony. Any objection was required to be asserted during trial.

> C.      Mr. Murphy fails to demonstrate that the trial court breached a duty or abused its discretion when it did not bifurcate the wrongful death claim sua sponte

Mr. Murphy also argues that when the trial court ruled that the dead man's statute did not apply to the wrongful death claim asserted on behalf of the children, it was an abuse of discretion not to "sever—or at least to *consider* severing—the individual- and representative-capacity claims so that the representative claim would not be prejudiced by the loss of the deadman's statute's testimonial protections." Opening Br. of Appellant at 42. Implicit in this argument is an acknowledgment that because the statute did not apply to the wrongful death claim, the court could not exclude the evidence altogether.[10]

As the court's instructions explained to the jury, Mr. Murphy's survival claim on behalf of the estate was for the personal losses suffered by Kathleen, and the damages sought were her medical expenses and damages for personal injury, pain, suffering, and

---

[10] Although not addressed by the parties, a limiting instruction might have been an option, although it would doubtless have been difficult for the jury to apply. In *Dennick v. Scheiwer*, 381 Pa. 200, 113 A.2d 318, 319 (1955), the plaintiff sued under a death statute and brought a survival action, and the court held he was "a competent witness generally." The trial court had observed, "'To tell the jury to listen to the defendant in one claim and close its ear in the other might possibly be technically correct but practically senseless.'" *Id.*

loss of enjoyment of life until her death. His wrongful death claim was for the losses

suffered by her children, as beneficiaries of the estate, and the damages sought were for

the loss of Kathleen's love, care, companionship and guidance. As acknowledged by Mr.

Murphy's counsel, the claims were joined by Mr. Murphy "as a matter of judicial

economy." Opening Br. of Appellant at 42.

CR 42(b) provides that the court may order a separate trial of any claim or issue,

in furtherance of convenience or to avoid prejudice. Mr. Murphy might have sought an

order bifurcating the wrongful death claim, but he did not.

We review a trial court's decision whether to order separate trials for abuse of

discretion, and will not reverse the court's decision if it rests on tenable bases. *Del

Rosario v. Del Rosario*, 116 Wn. App. 886, 901, 68 P.3d 1130 (2003) (citing *Hawley v.

Mellem*, 66 Wn.2d 765, 768, 405 P.2d 243 (1965)), *aff'd in part, rev'd in part on other

grounds*, 152 Wn.2d 375, 97 P.3d 11 (2004). When a personal representative chooses to

join survival and wrongful death claims in the same action, and to proceed with the

claims as joined after the ramifications for the dead man's statute are identified, any

reasonable judge would infer that the personal representative views a single trial as most

convenient and least prejudicial. *And cf. Armstrong v. Marshall*, 146 S.W.2d 250, 252

(Tex. Ct. App. 1940) (since evidence was admissible as applied to the survival action,

and no request was made to limit it to the other cause of action, appellants were in no position to complain of its admission).

Mr. Murphy identifies no legal authority that required the trial court to raise bifurcation under CR 42(b) sua sponte. We find no abuse of discretion.

D.      Challenged testimony

Mr. Murphy identifies testimony by each of Drs. Chaudhry, Cutter and Nichols that he contends should have been cut off or struck by the trial court, sua sponte.

1.      Testimony by Dr. Chaudhry about Kathleen's ability to understand his communications

Mr. Murphy points out that in questioning by Mr. Murphy's lawyer, Dr. Chaudhry testified he was not present for Dr. Rajendra's discussion with the family on June 5, so his understanding of what was said was limited to what the medical record reflected. Dr. Chaudhry also sometimes testified in response to questions that he did not recall a particular interaction with Kathleen, and would have to rely on the records. From this, Mr. Murphy argues that Dr. Chaudhry's answers to the following questions from Dr. Chaudhry's own lawyer were "speculation, which should not have been admitted," Opening Br. of Appellant at 46:

> Q.      . . . Now, let's go back to your actual discussions with Ms. Murphy. Any concerns about her ability to understand what you were saying?
> A.      Not at all.

Q.    Can you provide any more detail relating to the discussion and the back-and-forth that gave you that impression?

A.    So at multiple times, from 6/4 when she spoke to Dr. Raj, 6/5 and 6/6 with me, she was very clear she wanted to go for a cure. And I asked her multiple times. Even in the clinic, she was very clear she wanted to go for a full cure. So there was no doubt in my mind that she and the family had chosen the path of curative therapy.

Q.    Did she express to you understanding when you did—when you explained the risks and benefits of the drugs?

A.    Yes, she did.

RP at 1156-57. Mr. Murphy also contends that this testimony violated the dead man's statute.

No objection was made to these questions or answers in the trial court. Mr. Murphy had a standing objection to the trial court's ruling that the dead man's statute did not apply, but on appeal, he does not challenge that ruling on the merits—he merely argues that the trial court should have bifurcated the claims, sua sponte, which we reject in section II.C. Assuming without agreeing that the questions called for Dr. Chaudhry to speculate, error was not preserved.

> 2.    Testimony by Dr. Cutter about his August 13 conversation with Kathleen and Susan

Mr. Murphy next points out that when Dr. Cutter was questioned by Mr. Murphy's lawyer, he testified that he could not recall speaking to Dr. Howard about Kathleen on September 15, but he likely did speak to him, based on a note in the medical records. Elsewhere, Dr. Cutter testified that Dr. Elmer was also involved in Kathleen's care "[b]ut

I don't recall what discussions I had with who" and his only independent recollection of his conversation with the doctors was the medical records.  RP at 642-43.

Based on that testimony, Mr. Murphy argues that almost four pages of transcribed testimony by Dr. Cutter about the August 13 note of his conversation with Kathleen and her daughter "could only be speculation, and . . . should not have been admitted." Opening Br. of Appellant at 46-47 (identifying testimony at RP 648-52).  At no point in that testimony was any objection made.  Assuming without agreeing that the questions called for Dr. Cutter to speculate, error was unpreserved.

> 3.  Testimony by Dr. Nichols

Finally, Mr. Murphy contends the trial court should have cut off parts of defense counsel's examination of Dr. Nichols sua sponte.  The first occasion was questioning by defense counsel about a note electronically signed by Dr. Rajendra on June 4.  Much of what Dr. Nichols stated in response was quoting from the medical record, so we revise the formatting to make Dr. Nichols's relatively limited testimony more easily discerned (the quoted testimony is italicized and set off as appropriate):

> Q.      . . . [W]ill you read through that addendum and tell me if it is consistent or inconsistent with what you would expect for documenting informed consent?
>
> A.      Okay.  So it starts with
>
> "*I had an extensive d/w,*" [discussion with*]*, "*the family, daughter, and son Mike.  I discussed the final pathology.  I reiterated that I would discuss the pathology again with Dr. Corn to confirm.  I next discussed staging;*

26

> [*workup*] *which would include CT* [*of the chest, abdomen, and pelvis*] *(done); Echo;* [*pulmonary function tests*]*; PICC/,"*

which is the catheter that's put in under the (indicating) clavicle to administer chemotherapy;

> "*and a bone marrow biopsy. Port once they decide to proceed with chemotherapy. I discussed that if they decided to proceed with* chemo[therapy]*, which they seem very keen on doing, I recommended 4 cycles of ABVD followed by* [*a*] *restaging PET/CT and then additional 2 cycles of ABVD, switching therapy—v*[*ersus*] *Switching therapy based on the results of PET/CT based on the Deauville Criteria.*"

The Deauville criteria are a graded criteria about how metabolically active the PET scan is.

> "*I discussed the chemotherapy agents used and their toxicities for each of these agents. I also discussed the prognosis for advanced stage* [*Hodgkin lymphoma*]*. Finally, they also were concerned about the patient's mentation* [*and*]*—and she feeling sluggish and lethargic, which is very unusual for their mother. I recommended checking for adrenal insufficiency, and if this—that's not the case, doing the LP for CSF,*"

which is cerebral spinal fluid, which is the fluid that surrounds the spinal cord,

> "*or even an MRI brain. All of their questions were answered. I spent a total of 35-40 minutes discussing her patho*[logy, ]*physiology/staging,* [*workup*]*, treatment options, and answering all their questions.*"

Q.    Is that inconsistent or consistent with what you would expect in relation to informed consent regarding the administration of ABVD?

A.    It's consistent with my practice and my understanding and experience with the practice in Washington.

Q.    And spending 35 to 40 minutes with them in that discussion, is that also consistent with . . .

A.    I would say that—I never say excessive, but it's more than is typically spent, yes.

RP at 797-98 (quoting Ex. D102 at 229) (format modified).

No. 37545-5-III
*Murphy v. Medical Oncology Assoc., PS*

Defense counsel then questioned Dr. Nichols about a note Dr. Cutter entered in the medical records on the day he administered AVD, omitting bleomycin. Defense counsel asked Dr. Nichols to read through Dr. Cutter's assessment and "let me know when you're done there." RP at 803. This testimony followed:

A. (Looking at a document.) I'm done.

Q. And then under "Plan," do you see No. 2?

A. I do.

Q. Indicates the plan that Dr. Cutter had put into play, or intended to put in play?

A. I do.

Q. And then ultimately No. 5, what's that indicate to you?

A. Number 5 says, "I went over the above in detail with both the patient and her doctor."

Q. If Dr. Cutter testified not only consistent with the record there as well as indicated the assessment was discussed and that's what he meant by in No. 5 in relation to "Went over the above in detail," is that consistent with you with providing necessary information for informed consent?

A. Yes.

RP at 803-04. Mr. Murphy contends that all of the foregoing testimony was speculative, unreliable and prejudicial, and should have been excluded. Assuming without agreeing that the testimony was objectionable on any of those bases, error was not preserved.

Finally, Mr. Murphy complains about a line of questioning of Dr. Nichols that is reflected on a full five pages of the trial transcript. Defense counsel began by asking, "[I]f you were meeting with Ms. Murphy . . . what's the material information that you

28

would have provided to her for what you consider to be informed consent?" and

thereafter, "[T]ake us through what you would have said to Ms. Murphy." RP at 789-90.

Representative of the nature of Dr. Nichols's response is the following snippet:

> "We are going to give four drugs: [o]ne has—is hard on your heart or can
> be hard on your heart, can be hard on your bone marrow; one can be hard
> on your lungs and cause lung stiffening and breathing problems; one can
> cause muscle aches, constipation, and be hard on your bone marrow; and
> the other can be hard on your bone marrow and blood and platelet counts.
> We'll check you carefully. We'll do what we can. But any or all of those
> drugs, alone or in combination, can rarely cause catastrophic outcomes and
> death."

RP at 792. At the conclusion of Dr. Nichols's articulation of what he would have said to

Kathleen, defense counsel asked if Dr. Nichols would have noted the entire conversation

on Kathleen's chart. The doctor answered, "No," explaining, "My chart note would be

something like, 'I had a long discussion with Ms. Murphy . . . about her diagnosis, her

prognosis, treatment option—general treatment options and general discussion of toxicity

and of risk and benefit from the—from ABVD.'" RP at 794. The unstated implication

was that Dr. Chaudhry's similarly succinct chart note could summarize what had been a

much lengthier discussion with Kathleen. At no point during the questioning did Mr.

Murphy object.

Mr. Murphy argues that this testimony was "profoundly and overwhelmingly

prejudicial," and the trial court had discretion to strike it sua sponte under *In re Estate of

Hayes*, 185 Wn. App. 567, 591-92, 342 P.3d 1161 (2015). Opening Br. of Appellant at

29

51-52. *Hayes* merely holds that a trial court has *discretion* to strike evidence sua sponte, not that it can have a duty to do so. Not only does *Hayes* not recognize any duty, it holds that the court's discretion to strike testimony sua sponte is limited and can be abused, explaining, "'"[I]t is only when the evidence *is irrelevant, unreliable, misleading, or prejudicial, as well as inadmissible*, that the judge should exercise [the] discretion[ ] . . . to intervene."'" *Id.* at 592 (alteration in original) (quoting *Vachon v. Pugliese*, 931 P.2d 371, 381 (Alaska 1996) (quoting 1 JOHN W. STRONG, MCCORMICK ON EVIDENCE § 55, at 225 (4th ed. 1992))).

Assuming without agreeing that this testimony by Dr. Nichols was excludable under ER 403, error was not preserved.

III.   DENYING THE NEW TRIAL MOTION WAS NOT AN ABUSE OF DISCRETION

Finally, Mr. Murphy assigns error to the trial court's denial of his motion for a new trial. In moving for a new trial, Mr. Murphy had argued that because Dr. Rajendra did not testify, Dr. Chaudhry was unaware whether Dr. Rajendra discussed with Kathleen the option of omitting bleomycin, and Dr. Chaudhry admitted that he, himself, did not speak with her about that alternative, the evidence was insufficient to support a defense verdict on the informed consent claim.

The jury was properly instructed that Mr. Murphy's informed consent claim required him to prove each of the following elements:

First, that the Defendants failed to inform the patient of a material fact or facts relating to the treatment;

Second, that the patient consented to the treatment without being aware or fully informed of such material fact or facts;

Third, that a reasonably prudent patient under similar circumstances would not have consented to the treatment if informed of such material fact or facts; and

Fourth, that the treatment in question was a proximate cause of injury to the patient.

Clerk's Papers (CP) at 260 (Instr. 15); *see* RCW 7.70.050(1). The jury was further instructed, as to the meaning of "material facts," that

[a] medical oncologist has a duty to inform a patient of all material facts, including risks and alternatives, that a reasonably prudent patient would need in order to make an informed decision on whether to consent to or reject a proposed course of treatment.

A material fact is one to which a reasonably prudent person in the position of the patient would attach significance in deciding whether or not to submit to the proposed course of treatment.

CP at 259 (Instr. 14); *see* RCW 7.70.050(2).

The trial court's order identified three grounds on which to deny the new trial motion, with the following findings:

3. The jury heard testimony that the medical records demonstrated compliance with informed consent consistent with Washington law.

4. It is reasonable to infer that the jury believed that Ms. Murphy would have consented to the use of ABVD regardless of the risk.

5. Further, the jury heard testimony that allowed them to infer that Bleomycin was not the proximate cause of Ms. Murphy's death.

CP at 381.

CR 59 permits the trial court to order a new trial following a jury's verdict when "there is no evidence or reasonable inference from the evidence to justify the verdict." CR 59(a)(7). We review the denial of a motion for a new trial for abuse of discretion. *Conrad v. Alderwood Manor*, 119 Wn. App. 275, 290, 78 P.3d 177 (2003). Where the proponent of a new trial argues the verdict was not based on the evidence, appellate courts will look to the record to determine whether there was sufficient evidence to support the verdict. *Coogan v. Borg-Warner Morse Tec Inc.*, 197 Wn.2d 790, 811-12, 490 P.3d 200 (2021) (citing *Palmer v. Jensen*, 132 Wn.2d 193, 197-98, 937 P.2d 597 (1997)). This analysis is akin to the inquiry courts make in considering a motion for judgment as a matter of law under CR 50, where the court is required to view the evidence and reasonable inferences in the light most favorable to the verdict, without regard to contrary evidence or inferences. *Id.* at 812. This substantial evidence review respects the jury's prerogative to evaluate and weigh the evidence. *Id.* (citing *Cox v. Charles Wright Acad., Inc.*, 70 Wn.2d 173, 176-77, 422 P.2d 515 (1967)).

There was sufficient evidence to support a jury finding that a reasonably prudent patient under similar circumstances would have consented to Kathleen's course of treatment if informed of material facts. This is an independently sufficient basis for the jury's verdict. Drs. Chaudhry and Cutter testified that they informed Kathleen of material facts, both testified that the treatment provided best met Kathleen's objective of

32

cure, and Dr. Nichols agreed that he would have pursued the same course of treatment. That testimony, if credited by jurors, supported this finding.

Mr. Murphy complains that the trial court's finding was that "[i]t is reasonable to infer that the jury believed that *Ms. Murphy* would have consented to the use of ABVD regardless of the risk," thereby misanalyzing the essential element as subjective. CP at 381 (emphasis added). But the same evidence that supports the trial court's subjectively-framed finding supports our objectively-framed finding. In our review for abuse of discretion, we may affirm the trial court on any basis that the record supports. *Coogan*, 197 Wn.2d at 820 (citing *State v. Arndt*, 194 Wn.2d 784, 799, 453 P.3d 696 (2019)).

There was also sufficient evidence to support a jury finding that Mr. Murphy failed to prove that the treatment in question was a proximate cause of Kathleen's death. This, too, is an independently sufficient basis for the jury's verdict. While Drs. Sweetenham and Fishbein testified that the underlying lung injury was caused by bleomycin toxicity, aggravated by the Neulasta, Dr. Nichols testified that Kathleen's death was more likely caused by something else, and Dr. Howard testified he would attribute it to ARDS of undetermined etiology.

Since the trial court's decision can be affirmed on both these grounds, we need not reach its third alternative ground (that the medical records, as explained by the testimony, sufficiently demonstrated compliance with the requirement for informed consent).

33

No. 37545-5-III
*Murphy v. Medical Oncology Assoc., PS*


Affirmed.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Fearing, C.J.

_____
Pennell, J.

34