IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 38849-2-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| JESUS SANTOS, JR., | ) | |
| | ) | |
| Appellant. | ) | |

PENNELL, J. — Jesus Santos Jr. appeals his convictions for unlawful imprisonment and fourth degree assault. He raises a double jeopardy challenge and claims instructional error. We disagree with the double jeopardy claim, but agree instructional error requires reversal of the unlawful imprisonment conviction. This matter is remanded for further proceedings.

BACKGROUND

Mr. Santos went to trial on charges of unlawful imprisonment, second degree assault by strangulation or suffocation, and fourth degree assault. The incident giving rise to the charges occurred in August 2018 and involved Mr. Santos's romantic partner, J.A.L. At trial, Mr. Santos and J.A.L. each testified and provided different accounts of the incident.

*J.A.L.'s testimony*

J.A.L. testified the incident occurred after Mr. Santos arrived home late at night, after his swing shift. Mr. Santos came home with some friends and, although J.A.L. did not interact with the group, she suspected they were drinking alcohol and smoking cannabis. After the friends left, Mr. Santos knocked on the door of the bedroom where J.A.L. was resting with the couple's infant son. Mr. Santos repeatedly knocked on the door to the room and yelled at J.A.L. to open the door. J.A.L. told Mr. Santos to go to sleep, but he said he wanted to sleep with the baby. J.A.L. did not want Mr. Santos to be around the baby because she suspected he was inebriated.

J.A.L. eventually opened the door and Mr. Santos came in, grabbed the baby and, when J.A.L. asked for the baby to be returned to her, Mr. Santos threw the baby on the bed. Then Mr. Santos began tearing pages out of J.A.L.'s diary and threw them in the toilet. J.A.L. tried to call a domestic violence agency, but inadvertently dialed the agency's fax number. J.A.L. told Mr. Santos she was going to call the police, and he snatched the phone from her. At that point, J.A.L. tried to leave the home through the back door but Mr. Santos "shut the door on [her,]" smashing two of her fingers in the doorjamb. 1 Rep. of Proc. (RP) (Mar. 1, 2022) at 227.

2

J.A.L. then tried to leave through a different door, but Mr. Santos "did not allow [her] to get out. He shut the door on [her] again." *Id*. at 228. At one point, J.A.L. was able to leave the house, but Mr. Santos "pulled [her] back" and she felt she could not leave "because he was behind [her]." *Id*. at 229. J.A.L. told Mr. Santos multiple times she wanted to get out of the house, but he kept asking her what she wanted to do outside. J.A.L. used her phone to call Mr. Santos's cousin, Victoria Ruelas, who had befriended J.A.L., and asked Ms. Ruelas to come pick her up.

At that point, J.A.L. and Mr. Santos fought over control of the phone. Mr. Santos then picked J.A.L. up with both hands by her neck and pushed her up against a wall, restricting her airway and, over the course of one to two minutes, made it difficult for her to breathe. J.A.L. felt like she was about to pass out. She told Mr. Santos to leave her alone and then he let her go. J.A.L. tried to leave the house again, but Mr. Santos held her back. While she was "looking for the number to the police," Mr. Santos snatched J.A.L.'s phone and grabbed her shoulders. *Id.* at 233-34.

Around this time, Ms. Ruelas walked into the house. J.A.L. told Ms. Ruelas to call the police, but Ms. Ruelas did not do so. On cross-examination, J.A.L. agreed she had her own phone in her hands at the time but did not dial 911 because, she explained, she did not understand this was the number to call for the police.

3

Ms. Ruelas told Mr. Santos to let J.A.L. go or she would call her father—Mr. Santos's uncle. That prompted Mr. Santos to let J.A.L. go. J.A.L. and her baby then left in Ms. Ruelas's car. J.A.L. estimated the entire incident lasted either one or two hours. On cross-examination, J.A.L. agreed she did not tell Ms. Ruelas anything about what happened that night, did not show Ms. Ruelas any marks or bruises, did not seek any medical attention, did not take any photographs, and told Ms. Ruelas everything was okay when Ms. Ruelas asked.

J.A.L. stayed with Ms. Ruelas for two days before returning to Mr. Santos, who begged for forgiveness. J.A.L. then began spending time with Maria Maendez, a friend of Mr. Santos's uncle. On October 9, 2018, J.A.L. was having dinner at Ms. Maendez's home when Mr. Santos came over and picked up their son. Ms. Maendez and J.A.L. contacted the police because J.A.L. did not want Mr. Santos to leave with the baby. After law enforcement arrived, J.A.L. reported the August incident.

*Mr. Santos's testimony*

Mr. Santos offered a different account of the events. According to Mr. Santos, J.A.L. had been emotionally volatile since giving birth. When his friends left the night of the incident, Mr. Santos went inside to check on J.A.L. and the baby, and found them lying together on a bed in the baby's room. Mr. Santos thought J.A.L. looked

4

uncomfortable, so he reached for the baby in order to allow J.A.L. to stretch out. In response to this action, J.A.L. immediately snapped and told him not to touch the baby. She then became upset and started ripping pages from her diary, saying she wanted to leave. Mr. Santos denied ever throwing his son. At some point, J.A.L. contacted Ms. Ruelas to come pick her up.

J.A.L. then left the house through the front door, but came back inside of her own volition. Mr. Santos denied that any of J.A.L.'s fingers were ever caught in a door, that her fingers were injured, or that he ever grabbed her or pulled her back. After she returned inside, J.A.L.'s mood shifted from anger to sadness. Mr. Santos hugged J.A.L. to console her and J.A.L. tearfully stated, "'I'm tired of all this. I just want to go.'" *Id.* at 400. Mr. Santos responded, "'Okay, that's fine. [Ms. Ruelas is] on her way. Just wait for her.'" *Id.* J.A.L. kept saying she wanted to leave, but Mr. Santos wanted her to stay and wait for Ms. Ruelas because it was around three o'clock in the morning; J.A.L. was unfamiliar with the area given they had recently moved there; it was cold; she was barefoot; and she did not have a sweater on.

J.A.L. never told Mr. Santos to let her go or stop hugging her, and he denied he ever touched her neck. When Ms. Ruelas arrived, J.A.L.'s mood shifted from sadness

back to anger, and Mr. Santos helped load Ms. Ruelas's car with J.A.L.'s suitcase and the baby. The entire incident lasted five to six minutes.

The next day, he went to see J.A.L., who returned with him, and they lived together until the day of his arrest. On October 9, 2018, Mr. Santos went to pick up his son from Ms. Maendez's house, where J.A.L. was having dinner, and took the baby back to his home. Two hours later, several police vehicles arrived at Mr. Santos's home and he was arrested.

On cross-examination, Mr. Santos was asked about a statement he made to law enforcement at the time of his arrest. He agreed that, when asked if J.A.L. was free to leave at the time of the incident, he told law enforcement he "'did not want'" her to leave. *Id.* at 441-42, 464-65. During his testimony to the jury, Mr. Santos explained he did not tell law enforcement he actually stopped or prevented J.A.L. from leaving; nor did he tell law enforcement she was, in fact, not free to leave, notwithstanding his desire she stay put.

*Jury instructions and closing arguments*

The trial court gave jury instructions in line with proposals submitted by the State.

Jury instruction 6 defined the crime of unlawful imprisonment. It stated that a person is guilty of unlawful imprisonment if they restrict another person's movements

"without the other person's consent, *or* . . . by physical force, intimidation, or deception."

Clerk's Papers (CP) at 76 (emphasis added); *see also* 1 RP (Mar. 2, 2022) at 490.

Jury instruction 7 was the to-convict instruction for unlawful imprisonment.

Subsection (1) of the instruction required that to be found guilty Mr. Santos must have

restrained J.A.L., and subsection (2) required "[t]hat such restraint was (a) without

[J.A.L.'s] consent *or* (b) accomplished by physical force, intimidation, or deception."

CP at 77 (emphasis added); *see also* 1 RP (Mar. 2, 2022) at 491. In three instances, jury

instruction 7 described subsections(2)(a) and (2)(b) as "alternative" elements, either

of which would support a conviction. *Id*.

Mr. Santos did not object to the wording of either jury instruction 6 or 7.

During summation, the trial prosecutor argued that Mr. Santos unlawfully

imprisoned J.A.L. by "closing the door and keeping her from running out [of] the house

or . . . [by] grabbing her." 2 RP (Mar. 2, 2022) at 512. The State argued Mr. Santos was

guilty of assault because he "grabb[ed]" J.A.L. and "pull[ed] [her] back in the house."

*Id.* at 512-13. Mr. Santos's counsel urged the jury to disbelieve J.A.L.'s testimony.

*Verdict and sentence*

The jury found Mr. Santos guilty of unlawful imprisonment and fourth degree

assault. The jury acquitted Mr. Santos of second degree assault by strangulation. The trial

court subsequently imposed a sentence of six months' incarceration. The court found

Mr. Santos was indigent and imposed only the then-mandatory legal financial obligations.

Mr. Santos timely appeals.

ANALYSIS

*Double jeopardy*

Mr. Santos contends his convictions for both unlawful imprisonment and fourth

degree assault violate his right to be free from double jeopardy. Although this argument

was not raised during trial, we review it as a claim of manifest constitutional error. *See*

RAP 2.5(a); *State v. Mutch*, 171 Wn.2d 646, 661, 254 P.3d 803 (2011). Our standard of

review is de novo. *Mutch*, 171 Wn.2d at 661-62.

Both the state and federal constitutions provide that no person shall "be twice put

in jeopardy" for "the same" offense. U.S. CONST. amend. V; WASH. CONST. art. I, § 9.

The state and federal clauses are given the same interpretation. *See State v. Gocken*,

127 Wn.2d 95, 107, 896 P.2d 1267 (1995). The double jeopardy clauses prevent the

sentencing court from prescribing greater punishment for a single offense than the

legislature intended. *See State v. Kelley*, 168 Wn.2d 72, 77, 226 P.3d 773 (2010);

*In re Pers. Restraint of Orange*, 152 Wn.2d 795, 815-16, 100 P.3d 291 (2004).

Because double jeopardy questions are questions of legislative intent, this court "start[s] with the language of the statutes themselves." *State v. Calle*, 125 Wn.2d 769, 776, 888 P.2d 155 (1995); *see also Kelley*, 168 Wn.2d at 77. If statutory text explicitly or implicitly authorizes cumulative punishments for a single act, then this court's inquiry is at an end. *See State v. Freeman*, 153 Wn.2d 765, 771-72, 108 P.3d 753 (2005); *In re Pers. Restraint of Francis*, 170 Wn.2d 517, 523, 242 P.3d 866 (2010). For instance, in the context of burglary, the legislature has indicated, through statutory text, its intent to cumulatively punish burglary and associated crimes. *See Calle*, 125 Wn.2d at 776 (citing RCW 9A.52.050).

However, in most cases, the statutory text itself "is a dead end" because it "provide[s] no express or implicit representations." *Francis*, 170 Wn.2d at 523. In Mr. Santos's case, the relevant statutes do not speak—explicitly or implicitly—to the issue of multiple convictions and punishments. *See* RCW 9A.40.040 (unlawful imprisonment); RCW 9A.36.041 (fourth degree assault); *State v. Frohs*, 83 Wn. App. 803, 812-13, 924 P.2d 384 (1996) (concluding the legislature has not explicitly or implicitly authorized cumulative convictions for unlawful imprisonment and fourth degree assault). We therefore must look further.

In the absence of "clear legislative intent," this court applies the *Blockburger*[1] test. *Kelley*, 168 Wn.2d at 77. This test asks whether the defendant's convictions are "the same in law and in fact." *State v. Villanueva-Gonzalez*, 175 Wn. App. 1, 5, 304 P.3d 906 (2013), *aff'd*, 180 Wn.2d 975, 329 P.3d 78 (2014). As our Supreme Court has explained:

> If there is an element in each offense which is not included in the other, and proof of one offense would not necessarily also prove the other, the offenses are not constitutionally the same and the double jeopardy clause does not prevent convictions for both offenses.

*State v. Vladovic*, 99 Wn.2d 413, 423, 662 P.2d 853 (1983).

Mr. Santos's convictions were not for the same offense because each crime, as charged and proved, required proof of a fact that the other did not. *See Orange*, 152 Wn.2d at 817-18 (faulting intermediate appellate court for "compar[ing] the statutory elements" at an "abstract level" rather than as charged); *see also Calle*, 125 Wn.2d at 777 (noting double jeopardy analysis requires examining "each offense, as charged"); *Francis*, 170 Wn.2d at 524 (same); *State v. Ralph*, 175 Wn. App. 814, 825, 308 P.3d 729 (2013) (concluding double jeopardy was violated even though "the statutory elements of the two crimes differ[ed]" because "as charged and proved" the crimes were "functional equivalent[s]").

---

[1] *Blockburger v. United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 396 (1932).

To convict Mr. Santos of unlawful imprisonment, as charged, the State was required to prove he "restrict[ed]" J.A.L.'s "movements," which was not an element of fourth degree assault. CP at 18; *see also* RCW 9A.40.040; RCW 9A.40.010(6). And to convict Mr. Santos of fourth degree assault, as charged, the State was required to prove he "grabb[ed] and/or push[ed] her," which was not required for an unlawful imprisonment conviction. CP at 19; *see also id*. at 81, 84, 85.

Moreover, by virtue of the jury instructions, the jury's guilty verdicts indicate it found facts pertinent to each charge that were not necessary for the other. *See State v. Dye*, 178 Wn.2d 541, 556, 309 P.3d 1192 (2013) (noting juries are presumed to follow their instructions). The jury's guilty verdict as to assault did not require a finding of restricted movement, *see* CP at 81, 84-85; and the verdict as to unlawful imprisonment did not require an offensive touching, an attempt to inflict bodily injury, or an infliction of reasonable apprehension of imminent injury, *see id*. at 76-77.

The outcome of the *Blockburger* test is not dispositive; nevertheless, it creates a strong presumption of the legislature's intent. *See Frohs*, 83 Wn. App. at 808 (citing *Calle*, 125 Wn.2d at 780); *State v. Muhammad*, 194 Wn.2d 577, 620, 451 P.3d 1060 (2019) (plurality opinion). This presumption may be overcome "only by clear evidence of contrary intent." *Calle*, 125 Wn.2d at 780.

11

Here, there is no evidence of legislative intent to treat unlawful imprisonment and assault as the same offense. Thus, because Mr. Santos's offenses are neither the same in law nor in fact, his multiple convictions do not offend the constitutional prohibition of double jeopardy.

*Adequacy of to-convict instruction for unlawful imprisonment*

Mr. Santos contends the jury instructions related to unlawful imprisonment ran afoul of due process because they relieved the State of its obligation to prove he used "physical force, intimidation, or deception" to restrict J.A.L.'s movements. RCW 9A.40.010(6)(a). He argues the instructions failed to apprise the jury of the relevant legal standard because the disjunctive word "or"—used to connect the term of art "without consent" to its definition—gave the jury a mistaken impression of the law.

Again, Mr. Santos's argument on appeal is not one that was raised at trial. Nevertheless, this claim also qualifies for review as a "manifest error affecting a constitutional right." RAP 2.5(a)(3). A jury instruction that relieves the State of its burden of proof implicates the constitutional right of due process. *State v. Redwine*, 72 Wn. App. 625, 629, 865 P.2d 552 (1994). Our case law recognizes this type of error, if shown to have occurred in a particular case, will constitute manifest constitutional error. *See State v. O'Hara*, 167 Wn.2d 91, 100-01, 105, 217 P.3d 756 (2009); *State v. Stein*, 144 Wn.2d

12

236, 240-41, 27 P.3d 184 (2001).

We review a challenged jury instruction de novo, "examining the effect of a particular phrase in an instruction by considering the instructions as a whole and reading the challenged portions in the context of all the instructions given." *State v. Harris*, 164 Wn. App. 377, 383, 263 P.3d 1276 (2011). Juries must to be given accurate instructions on all essential elements of a charged crime. *State v. Van Tuyl*, 132 Wn. App. 750, 758, 133 P.3d 955 (2006); *see State v. Walden*, 131 Wn.2d 469, 473, 932 P.2d 1237 (1997) (noting jury instructions must "make the relevant legal standard manifestly apparent to the average juror"); *State v. Lorenz*, 152 Wn.2d 22, 31, 93 P.3d 133 (2004) (noting to-convict instructions must be accurate because they serve as the yardstick by which a jury measures guilt).

Mr. Santos was charged with unlawful imprisonment. "A person is guilty of unlawful imprisonment if he or she knowingly restrains another person." RCW 9A.40.040(1). The legislature has provided a definition of "restrain" in this context, including a requirement that the victim's movements be restrained "without" their "consent," a term of art that is also defined. RCW 9A.40.010(6). The full definition reads as follows:

> "Restrain" means to restrict a person's movements *without consent* and
> without legal authority in a manner which interferes substantially with his

> or her liberty. Restraint is '*without consent*' if it is accomplished by (a) physical force, intimidation, or deception, or (b) any means including acquiescence of the victim, if he or she is a child less than sixteen years old or an incompetent person and if the parent, guardian, or other person or institution having lawful control or custody of him or her has not acquiesced.

*Id.* (emphasis added). Thus, in cases like this one—where the victim was over 16 years old and not incompetent—restraint *must* be "accomplished by . . . physical force, intimidation, or deception" in order to secure a conviction. *Id.*

As worded, the jury instructions in Mr. Santos's case did not require restraint be accomplished by physical force, intimidation, or deception. Instead, the instructions incorrectly stated lack of consent was an alternative to physical force, intimidation, or deception. But as explained in RCW 9A.40.010(6), when it comes to a victim who is competent and over the age of 16, the only way a restraint is "without consent" is if it was accomplished through physical force, intimidation, or deception. If restraint was accomplished through other means, such restraint does not fall under the unlawful imprisonment statute, even if we might colloquially call it nonconsensual.

We recognize that mistakes regarding definitional instructions do not necessarily give rise to a manifest constitutional error. For example, the failure to provide a definitional instruction does not qualify. *See O'Hara*, 167 Wn.2d at 105. Nevertheless, the State has the burden to prove the elements of a charged crime according to applicable

14

statutory definitions. *Cf. State v. Stevens*, 158 Wn.2d 304, 309-10, 143 P.3d 817 (2006)

(holding, in child molestation case, the State still has burden to prove "sexual

gratification" even though it is just a definitional term and not an essential element).

Thus, if the trial court's instructions affirmatively misstate a definition applicable to the

elements of an offense, this error will be manifest if it plausibly relieved the State of its

burden of proof as to the elements.

Here, the trial court's instructions affirmatively misstated the definition of

"without consent." Rather than accurately informing the jury that "accomplished by

physical force, intimidation, or deception" is the *definition* of "without consent"—that is,

that the two phrases are *synonymous*—instruction 7 explicitly told the jury, three times,

that the two phrases were "alternative" elements. CP at 77; *see also* 1 RP (Mar. 2, 2022)

at 491. Furthermore, both jury instructions 6 and 7 used the word "or" to connect the two

phrases. "Or" is most commonly "used as a function word to indicate . . . an *alternative*

between *different or unlike* things." WEBSTER'S THIRD NEW INT'L DICTIONARY 1585

(1993) (emphasis added).

Not only were the instructions incorrectly worded, the mistake in the instructions

relieved the State of its burden of proof. As worded, the instructions informed the jury it

could convict Mr. Santos if he restrained J.A.L. "without consent" *even if* that restraint

was not "accomplished by physical force, intimidation, or deception." While in the criminal context, lack of consent often involves force, intimidation, or deception, the same is not always true in ordinary parlance. As used in daily language, a person may conclude something was done without "consent" if there were no good choices, if there was subtle coercion, or if there was a lack of affirmative agreement or approval. *See id*. at 482 (defining "consent" by invoking the concepts of "agreement," "approval," and "permission"). And the unlawful imprisonment statute itself recognizes that, for persons who are incompetent or less than 16 years old, mere acquiescence can constitute lack of consent. RCW 9A.40.010(6). Because jury instructions 6 and 7 relieved the State of its burden to prove lack of consent as defined by statute, they contravened Mr. Santos's right to due process. *See Van Tuyl*, 132 Wn. App. at 758; *see also State v. Scott*, 110 Wn.2d 682, 690, 757 P.2d 492 (1988) (explaining criminal defendants should not be "convicted by a jury that misunderstands the applicable law").

An erroneous jury instruction will require reversal if it was prejudicial. This court presumes clear misstatements of the law are prejudicial. *Harris*, 164 Wn. App. at 383. To overcome this presumption, the State must show the error was "harmless beyond a reasonable doubt." *State v. Woods*, 138 Wn. App. 191, 202, 156 P.3d 309 (2007). An instructional error is harmless only if it is "'*trivial*, or *formal*, or *merely academic*'"

16

and "'*in no way affected the final outcome of the case.*'" *Walden*, 131 Wn.2d at 478

(quoting *State v. Wanrow*, 88 Wn.2d 221, 237, 559 P.2d 548 (1977) (plurality opinion)).

Here, the State has not shown a lack of prejudice. As worded, the jury instructions

were very confusing. There is a real risk the jury might have had doubts as to the level of

persuasion Mr. Santos used to convince J.A.L. to wait to leave the home until Ms. Ruelas

arrived to pick her up. Mr. Santos admitted to law enforcement that he did not want

J.A.L. to leave. And in his testimony, Mr. Santos stated he told J.A.L. to "[j]ust wait for"

Ms. Ruelas to arrive before leaving. 1 RP (Mar. 1, 2022) at 400. Particularly given the

jury rejected the State's proof as to second degree assault by strangulation, there is a risk

that the jury convicted Mr. Santos of restraining J.A.L. without concluding that the

restraint was accomplished by force, intimidation, or deception.

Because Mr. Santos has demonstrated his trial was marked by a manifest

constitutional error and the State has not shown lack of prejudice, the conviction for

unlawful imprisonment must be reversed. Our order of reversal is without prejudice

to retrial. *See Furfaro v. City of Seattle*, 144 Wn.2d 363, 382, 27 P.3d 1160 (2001).

In addition to challenging his convictions, Mr. Santos makes arguments regarding

his sentence. Because we reverse one of Mr. Santos's convictions, resentencing is

required. Accordingly, claims regarding sentencing may be raised on remand.

CONCLUSION

Mr. Santos's conviction for fourth degree assault is affirmed. The conviction for

unlawful imprisonment is reversed without prejudice to retrial. This matter is remanded

for further proceedings.

A majority of the panel has determined this opinion will not be printed in

the Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_____
Pennell, J.

WE CONCUR:

_____
Fearing, C.J.

_____
Lawrence-Berrey, J.